**Edward J. THAYER, Appellant,**

v.

**MUNICIPALITY OF ANCHORAGE, Appellee.**

No. 7846.

Court of Appeals of Alaska.

Aug. 17, 1984.

William F. Dewey, Birch, Horton, Bittner, Pestinger & Anderson, Anchorage, for appellant.

James A. Crary, Asst. Municipal Prosecutor, Allen M. Bailey, Municipal Prosecutor, Jerry Wertzbaugher, Municipal Atty., Anchorage, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

BRYNER, Chief Judge.

Following a jury trial, Edward Thayer was convicted of driving while intoxicated (DWI). AMC 9.28.020. Thayer appeals, challenging the admission of the breathalyzer test results at trial and the trial court's refusal to admit a transcript of expert witness testimony from a pretrial evidentiary hearing. We affirm.

On October 23, 1982, Thayer was arrested for DWI. A sample of Thayer's breath was tested on Smith & Wesson Breathalyzer model 900A, serial number 93208. The test results showed a blood-alcohol level of .21. In November of 1982, Thayer's attorney received information that Smith & Wesson, the manufacturer of breathalyzer instruments, had issued a customer advisory warning of the possibility that some breathalyzer instruments might be affected by radio frequency interference (RFI). The advisory recommended that each instrument be tested for RFI. Prior to trial, Thayer filed a request for discovery relating to the issue of RFI testing, and his case was consolidated with several other DWI cases for purposes of an evidentiary hearing.

Testimony at the evidentiary hearing focused on procedures that the Anchorage Police Department had used in testing for RFI. The municipality established that between October and December of 1982, in response to the Smith & Wesson RFI advisory, Anchorage Police Officer John Reed tested the municipality's breathalyzer instruments. However, Officer Reed apparently did not strictly adhere to the testing procedures recommended by Smith & Wesson. Accordingly, prior to trial, Thayer moved to suppress his breathalyzer test results, arguing that the municipality's RFI test was inadequate and untimely and therefore failed to meet foundational requirements for admission. District Court Judge Warren A. Tucker initially granted Thayer's motion, finding that no scientific evidence was presented to validate Officer

Reed's RFI testing procedures. The municipality subsequently filed a motion for reconsideration, and an additional evidentiary hearing was held on February 9, 1983.

At the February hearing, Dr. Richard Jensen, a radio frequency interference expert from Minnesota, testified generally about his experience with RFI and breathalyzers. Dr. Jensen further testified that he had tested the municipality's breathalyzers and that his tests indicated that RFI was not a problem with the instruments at their present location. Based on Jensen's testimony, Judge Tucker vacated his original suppression order. Thayer's breathalyzer result was admitted against him at his DWI trial.

### ADEQUACY OF RFI TESTING

On appeal, Thayer first challenges the trial court's denial of his motion to suppress. He contends that his breathalyzer result was inadmissible because the municipality did not meet the foundational requirements of AS 28.35.033(d). At the time of Thayer's arrest, AS 28.35.033(d) [1] provided:

> To be considered valid under the provisions of this section the chemical analysis of the person's breath shall have been performed according to methods approved by the Department of Health and Social Services.... If it is established at trial that a chemical analysis of breath was performed according to approved methods by a person trained according to techniques, methods and standards of training approved by the Department of Health and Social Services, there is a presumption that the test results are valid and further foundation for introduction of the evidence is unnecessary.

At the time of Thayer's arrest, 7 AAC 30.050(a) provided, in pertinent part:

### CALIBRATION OF INSTRUMENTS

(a) Each breathalyzer instrument shall be calibrated in accordance with the man-

ufacturer's instructions at intervals not to exceed 60 days.

(b) At the time of calibration the instructor performing the activity shall

(1) enter the date and calibration information in the Breathalyzer log;

(2) forward to the department a certificate containing the date of calibration, the serial number of the instrument and its location.

In September 1982, more than a month before Thayer's DWI arrest, Smith & Wesson issued the RFI advisory at issue in this case. The advisory states, in relevant part:

> Since the inception of evidential breath-testing for alcohol, changes have taken place in communications equipment used by law enforcement agencies. Radio transmissions, especially within the last few years, have increased significantly in number, broadcast frequencies, and power levels, resulting in an increase in the potential for radio frequency interference ("RFI") in the normal operation of electronic equipment. This includes some breath-testing equipment. However, because the "window of susceptibility" to RFI during the test cycle of Breathalyzer instruments is narrow—limited to a coincidence of specific frequencies and signal strengths during a restricted time interval—it should not be assumed that past test results were necessarily distorted even in the presence of some radio frequency energy.
>
> Earlier this year Smith & Wesson issued a customer advisory outlining a potential problem with the Breathalyzer Model 1000's susceptibility to radio frequency interference. Preliminary tests conducted at that time on the Breathalyzer Models 900 and 900A did not indicate a problem. Continuing investigation now suggests this early series of breath-testing instruments may be affected in an unpredictable manner by various frequencies and power levels. Further, the extent of sensitivity to particular frequencies and

---

**1.** AS 28.35.033(d) has since been amended to apply to the chemical analysis of blood as well as breath.

particular power levels will vary from instrument to instrument. Since test conditions were representative of some police environments, the possibility exists, although unlikely, for higher or lower than normal test results. *Therefore each instrument should be tested on location in accordance with Test One and Test Two procedures outlined in this advisory.*

. . . .

Once the radio frequency interference tests as outlined in Test One and Test Two have been completed, *subsequent testing would not be required unless one of the following conditions occur:*

1. A change in the department's radio operating frequencies or power output.
2. A change in the position, location, or type of base-station antenna.
3. *Repair or calibration of the instrument.*
4. A change in the operating location or general position of the instrument.
5. A change in the general background RFI environment of the instrument. [Emphasis added.]

Thayer specifically relies on the portion of the Smith & Wesson advisory that recommends retesting for RFI after "[r]epair or calibration of the [breathalyzer] instrument." Thayer points out that former 7 AAC 30.050(a) required calibration of breathalyzer instruments at intervals not to exceed sixty days. Because the regulation required calibration every sixty days and Smith & Wesson's advisory recommends renewed RFI testing whenever breathalyzer instruments are subjected to calibration, Thayer argues that the municipality was required to repeat Smith & Wesson's suggested RFI testing procedures at least once every sixty days, as part of its regular calibration process. Thayer maintains that, unless the municipality could demonstrate that RFI testing had occurred within the sixty-day period immediately before his arrest, his breathalyzer result was not presumptively admissible under AS 28.-35.033(d). The municipality, on the other hand, argues that it was not required to demonstrate compliance with Smith & Wesson's advisory to lay a proper foundation for admission of Thayer's breathalyzer results. We conclude that neither Thayer's position nor the position advocated by the municipality is correct.

The record indicates that the calibration procedure contemplated by former 7 AAC 30.050(a) differs significantly from what Smith & Wesson refers to in its advisory as "calibration" for purposes of renewed RFI testing. During the evidentiary hearings conducted by the district court, Dr. Harry Colvin, the director of Alaska's Public Health Laboratories, described the usual, sixty-day calibration procedure mandated by former 7 AAC 30.050(a). According to Dr. Colvin, breathalyzer operators were instructed to complete a standard checklist called the "Breathalyzer Calibration Report." The first nine steps of the checklist involve inspection of various parts of the breathalyzer instrument to assure proper operation. The checklist then requires a "blank" test of the instrument, followed by four tests with a known reference standard. All test results must be within tolerances specified by the manufacturer.

The procedure in this checklist, which implements former 7 AAC 30.050(a), does not entail any significant repair to or readjustment of breathalyzer instruments. This procedure is substantially similar to a procedure referred to as the "preventive maintenance checklist" in Smith & Wesson's breathalyzer instruction manual.

By contrast, Smith & Wesson appears to use the word "calibration" in a different way. While the Smith & Wesson instruction and service manuals for their breathalyzers mention "calibration," no instructions for on-location calibration are given, nor is any calibration procedure specified. The instruction manual states that a new instrument "comes from the factory completely checked, calibrated, and ready to use after the shipping screw has been removed." The manual advises that the instrument be rechecked, following the preventive maintenance checklist, prior to use.

However, no mention is made of any need for further calibration. The service manual recommends that breathalyzer instruments be returned to the factory if complete calibration becomes necessary due to a broken Corning filter. The manual states that should it become necessary to make calibration adjustments in the field because of a broken filter, a technical service bulletin is available. Thus, it appears that "calibration," as used in Smith & Wesson's instruction and service manuals, is not a routine procedure but entails significant readjustment of or repair to breathalyzer instruments.

The distinction between Smith & Wesson's use of the word "calibration" and the use of that word in former 7 AAC 30.050(a) is highlighted by the recent amendment to 7 AAC 30.050, which clarifies the terminology of the former regulation. While former 7 AAC 30.050 required each breathalyzer instrument to be "calibrated in accordance with the manufacturer's instructions at intervals not to exceed sixty days," the current regulation distinguishes between "calibration" and "verification of calibration":

> Each breath-test instrument must be calibrated in accordance with the manufacturer's specifications. At intervals not to exceed sixty days, the accuracy of the instrument's calibration must be verified. At the time of verification of calibration, the chemical test supervisor-instructor performing the activity must forward to the department a certification stating the date on which the verification of calibration was performed, the serial number of the instrument, and its location.

Thus, the current regulation's use of the word "calibration" is consistent with Smith & Wesson's use of the word, and the regular inspection process referred to by Smith & Wesson as "preventive maintenance" is

currently designated by 7 AAC 30.050(a) as "verification of calibration."

■ Comparing the manner in which "calibration" is used in Smith & Wesson's breathalyzer instruction and service manuals with its use in former and current 7 AAC 30.050(a), we conclude that the recommendation in Smith & Wesson's RFI advisory for renewed RFI testing when "repair or calibration" occurs, was not intended to require RFI testing each time a breathalyzer instrument is subjected to the routine, sixty-day procedure referred to as "calibration" in former 7 AAC 30.050(a) and as "preventive maintenance" by Smith & Wesson. Nothing in the Smith & Wesson advisory suggests that retesting for RFI is necessary at regular intervals; nor would the record support such a conclusion. We therefore find that it was not necessary for the municipality to establish, as a foundational prerequisite for admission of Thayer's breathalyzer result under AS 28.35.-033(d), that the instrument used to analyze Thayer's breath had been subjected to RFI testing within 60 days of his DWI arrest.[2]

It remains to be determined whether the municipality was under any duty at all to establish compliance with the Smith & Wesson advisory prior to admission of Thayer's breathalyzer result. The municipality argues that despite Thayer's challenge, it had no duty to establish compliance with the RFI advisory. We find it necessary, however, to reject the municipality's argument.

■ Under AS 28.35.033(d), Thayer's breathalyzer result was presumptively admissible if the municipality established, as a foundational matter, that the analysis of Thayer's breath was performed according to methods approved by the Alaska Department of Health and Social Services. Although the presumption of admissibility created by AS 28.35.033(d) is entitled to

---

**2.** Even if we assumed that RFI testing was required at sixty-day intervals under former 7 AAC 30.050, suppression would not necessarily follow. Rather, the municipality would simply be precluded from relying on the presumption of admissibility provided for in AS 28.35.033(d).

However, we believe that the expert testimony in the record supports Judge Tucker's finding that the municipality established an adequate foundation for the admission of the breathalyzer test results, independent of the presumption of admissibility in AS 28.35.033(d).

considerable weight,[3] it is not irrebuttable.[4] The trial court is ultimately charged with the duty of making preliminary factual determinations concerning the admissibility of evidence. *See* Evidence Rule 104(a). Where, as in this case, information is presented raising a substantial question whether existing procedures for testing breath are adequate to assure compliance with the manufacturer's specifications for proper operation of a breath testing device, it is within the trial court's authority under Evidence Rule 104(a) to require further foundation to be presented. The importance of assuring valid and reliable breathalyzer tests for use in criminal prosecutions is obvious. *See Keel v. State,* 609 P.2d 555, 557–58 (Alaska 1980); *Oveson v. Anchorage,* 574 P.2d 801, 805 (Alaska 1978); *Ahsogaek v. State,* 652 P.2d 505, 506 (Alaska App.1982); *Anchorage v. Serrano,* 649 P.2d 256, 259 (Alaska App.1982). The municipality depends on breathalyzer tests for effective prosecution of drunken drivers, and in many instances, breathalyzer test results are the primary if not the sole basis for a DWI conviction. Given the significance of breathalyzer testing in DWI cases, we do not think the municipality can properly disregard recommendations by the manufacturer of breathalyzer instruments when those recommendations address problems integrally related to the accuracy of breathalyzer test results.[5]

▮ In the present case, we conclude that Smith & Wesson's RFI advisory directly related to the accuracy of breathalyzer instruments and was sufficiently significant to require the municipality to prove substantial compliance with the manufacturer's recommended testing procedures. Thus, we hold that when a timely and appropriate challenge to admissibility of a breathalyzer test result is made, the municipality must, at a minimum, demonstrate that the breathalyzer instrument in question was tested successfully for RFI at least once in a manner substantially com-

**3.** *Cf.* Alaska Rule of Evidence 902(10):

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

(10) *Presumptions Created by Law.* Any signature, document, or other matter declared by enactment of the Alaska Legislature or rule prescribed by the Alaska Supreme Court to be presumptively or prima facie genuine or authentic.

**4.** Under A.R.E. 901(b), the trial court may, in its discretion, require the production of additional evidence to establish the foundational requirements for the admission of real evidence:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims, except as provided in paragraphs (a) and (b) below:

(a) Whenever the prosecution in a criminal trial offers (1) real evidence which is of such a nature as not to be readily identifiable, or as to be susceptible to adulteration, contamination, modification, tampering, or other changes in form attributable to accident, carelessness, error or fraud, or (2) testimony describing real evidence of the type set forth in (1) if the information on which the description is based was acquired while the evidence was in the custody or control of the prosecution, the prosecution must first demonstrate as a matter of reasonable certainty that the evidence is at the time of trial or was at the time it was observed properly identified and free of the possible taints identified by this paragraph.

(b) In any case in which real evidence of the kind described in paragraph (a) of this rule is offered, the court may require additional proof before deciding whether to admit or exclude evidence under Rule 403.

**5.** We note that 7 AAC 30.050(a) requires calibration of breathalyzer instruments "in accordance with manufacturer's specifications ...." While this regulation is not directly applicable to Smith & Wesson's RFI advisory, it demonstrates that the Department of Health and Social Services relies heavily on guidance from the manufacturer in establishing appropriate standards. To ignore this reliance in determining whether the municipality had a duty to comply with the Smith & Wesson advisory would, we believe, be unrealistic. The municipality undertook the responsibility of maintaining and operating breathalyzer instruments for purposes of assisting in the enforcement of its own DWI ordinances. The municipality's argument that it was under no duty to assure accurate performance of its breathalyzers except to the extent that the Department of Health and Social Services expressly required it to do so is untenable under the circumstances of the present case, where the RFI advisory was apparently simply overlooked by the Department of Health and Social Services.

plying with Smith & Wesson's recommendations,[6] and that none of the conditions for retesting listed in Smith & Wesson's RFI advisory occurred between the time of the initial RFI test and the challenged breath test.

We further hold, however, that the municipality adequately demonstrated compliance with the Smith & Wesson advisory in this case. Dr. Jensen tested the breathalyzer instruments operated by the municipality, using RFI testing procedures developed in the state of Minnesota. Thayer has conceded that these procedures substantially comply with the RFI testing procedures recommended by Smith & Wesson. Based on his tests, Dr. Jensen concluded that the municipality's breathalyzers were not adversely affected by RFI. Although Dr. Jensen's tests were conducted approximately four months after Thayer was arrested, Dr. Jensen testified that it was unlikely that radio frequency interference had been a problem at the time Thayer's breath was tested. There is nothing to indicate that any significant change occurred in the instrument or in background levels of radio frequency.[7] Under these circumstances, Judge Tucker did not err in finding that the municipality established an adequate foundation for admission of Thayer's breathalyzer test results.[8]

In holding Thayer's breathalyzer test results to be admissible, we do not mean to suggest that the municipality's compliance with Smith & Wesson's RFI advisory conclusively established the validity of the test results. We emphasize that our ruling applies only to the sufficiency of the foundation that the municipality was required to present before the test result was deemed admissible. Although his breathalyzer test result was admissible, Thayer was free to attack its accuracy and credibility based on possible RFI problems, as well as on other grounds. *See, e.g., Keel v. State,* 609 P.2d 555 (Alaska 1980); *Denison v. Anchorage,* 630 P.2d 1001 (Alaska App.1981).

## ADMISSIBILITY OF DR. JENSEN'S TRANSCRIPT

Thayer also argues that the trial court erred in refusing to allow the admission of two pages of a transcript of Dr. Jensen's testimony at the evidentiary hearing. At trial, Thayer called Officer Reed to testify about his attempts to test for RFI. Reed indicated that during his tests he noted deflections of .005 on the breathalyzer instruments alcohol pointer. During direct examination by Thayer, Reed testified that that he thought that the deflections he observed were from "jiggling the lazy susan" that held the breathalyzer instrument rather than from RFI. Reed indicated, however, that he was not aware that deflections of more than .005 would be considered unacceptable under the RFI testing procedure adopted in Minnesota.[9]

6. It is clear that substantial compliance, rather than strict, or literal compliance with Smith & Wesson's recommendations is all that is required. *See, e.g., Oveson v. State,* 574 P.2d 801, 804–05 (Alaska 1978) (substantial compliance test applied to completion of "Breathalyzer Operational Checklist"); *Wester v. State,* 528 P.2d 1179, 1184 (Alaska 1974), *cert. denied,* 423 U.S. 836, 96 S.Ct. 60, 46 L.Ed.2d 54 (1975) (substantial compliance test applied to fifteen-minute observation period); *Ahsogaek v. State,* 652 P.2d 505, 506 (Alaska App.1982) (substantial compliance test applied to sixty-day calibration).

7. The Smith & Wesson RFI advisory recommends retesting where there is "[a] change in the operating location or general position of the [breathalyzer] instrument." Evidence introduced in the district court indicated that in the interim between Thayer's arrest and Dr. Jensen's test, the breathalyzer instrument which

was used to test Thayer's breath was moved from a table to a nearby shelf in the same room. The instrument had apparently been restored to its original position at the time of Dr. Jensen's test. Dr. Jensen testified that, in his opinion, moving the instrument in this manner would not necessitate retesting.

8. Other jurisdictions have recently rejected RFI challenges, finding that the prosecution had established an adequate foundation for the admission of the breathalyzer test results. *See Commonwealth v. Neal,* 392 Mass. 1, 464 N.E.2d 1356 (1984); *Romano v. Kimmelman,* 96 N.J. 66, 474 A.2d 1 (1984).

9. The municipality apparently did not object to Officer Reed's testimony. Although Officer Reed's October test was arguably relevant, its probative value is minimal, given Judge Tuck-

On cross-examination, Reed testified that a .005 deviation was not significant and that neither his test nor Dr. Jensen's test indicated that radio frequency interference was a problem. Thayer objected to the scope of Officer Reed's testimony on cross-examination, arguing that Officer Reed was not qualified to offer his opinion on the conclusions that could be drawn from the test results. Thayer's objection was overruled. Thayer then sought to introduce two pages of Dr. Jensen's testimony from the evidentiary hearing. In this portion of the transcript, Dr. Jensen stated that the failure point under the Minnesota test was a deviation greater than .005. Thayer argued that the selected portion of the transcript was admissible under Evidence Rule 804(b)(1), the former testimony exception to the hearsay rule, and Evidence Rule 803(23).[10] The municipality objected to the admission of the transcript; Judge Tucker ruled that the two pages of transcript were not admissible under any of the hearsay exceptions. Judge Tucker also questioned the relevance of Thayer's excerpt from the transcript and stated that he was concerned that if he admitted a portion of Dr. Jensen's testimony, the municipality would be entitled to introduce his complete testimony.

We do not believe that Judge Tucker abused his discretion in ruling that the two pages of transcript were inadmissible. Assuming that the transcript excerpt was admissible under an exception to the hearsay rule, it could properly be excluded under Evidence Rule 403.[11] Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The excerpt from Dr. Jensen's testimony at the evidentiary hearing was of tenuous probative value. The evidence presented at the first evidentiary hearing in December of 1982 indicated that Officer Reed had not followed Smith & Wesson's recommended testing procedure. Accordingly, it is doubtful that Jensen's testimony, which related exclusively to the significance of variations caused by RFI under his own testing procedures, is of great value.[12] In reference to Officer Reed's test, Dr. Jensen was asked whether he would be concerned if an

---

er's original finding that there was no scientific basis for Officer Reed's test procedure because he had not strictly followed the Minnesota protocol which he purported to use.

**10.** A.R.E. 803(23) provides, in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(23) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (a) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence.

A.R.E. 804(b)(1) provides:

(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

**11.** We do not decide what constitutes unavailability under A.R.E. 804(b)(1) where the defendant seeks to introduce the full transcript of an expert witness's testimony. *See Morton v. State,* 684 P.2d 144 (Alaska App.1984). *See generally* Annot. 3 A.L.R.4th 87 (1981).

**12.** In the two pages of transcript Thayer sought to introduce, Dr. Jensen testified that his failure point was a deviation "greater than .005," not .005 *or* greater, as Thayer contends. Moreover, Officer Reed's test did not indicate any deviations *greater* than .005. Thus, even if Officer Reed's test was valid, the breathalyzer would still have "passed" the radio frequency interference test under Jensen's standard.

instrument that had previously "failed" an RFI test indicated no deviation in a later test. Dr. Jensen stated that if an officer he had trained to evaluate the potential for RFI had found a significant deviation in the initial test, he would be concerned. However, he made it clear that he could not "comment on somebody else's procedure." Thus, the pages from Dr. Jensen's testimony that Thayer sought to introduce involved a general description of Jensen's testing procedure; Dr. Jensen was not commenting on Officer Reed's test. The record as a whole supports Judge Tucker's conclusion that when Dr. Jensen discussed his own failure point he was "talking about a result obtained from a very carefully controlled protocol in his context, not in the context of [Officer Reed's test]."

Furthermore, under the circumstances it is evident that had the two pages proffered by Thayer been admitted, the municipality would have been entitled to introduce Jensen's complete testimony. *See* Evidence Rule 106.[13] The complete transcript would have shown the context of Officer Reed's test and also would have indicated that Dr. Jensen's test of the municipality's breathalyzer demonstrated that RFI was not a problem. Although this evidence would have been marginally relevant to Thayer's case, the trial court could find that its prejudicial effect outweighed its probative value. Admission of the seventy-four pages of Dr. Jensen's highly technical scientific testimony might have been time consuming and burdensome to the jury. It may very well have distracted the jury from its consideration of the issue of the case.[14] *See* A.R.E. 403. We therefore conclude that Judge Tucker did not abuse his

discretion in refusing to admit the transcript of testimony previously given by Dr. Jensen at the evidentiary hearing.

The conviction is AFFIRMED.

---

**13.** A.R.E. 106 provides:
*Remainder of, or Related Writings or Recorded Statements.*
    When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

**14.** Thayer's contention that admission of the transcript was necessary to rebut Officer Reed's testimony is based, in part, on the assumption

that Judge Tucker improperly overruled Thayer's objection to the scope of the municipality's cross-examination of Officer Reed. Although this point is listed in Thayer's points on appeal, it was not briefed and has apparently been abandoned. Thayer's counsel made a tactical decision to call Officer Reed as a defense witness to testify about the tests that he performed. Thus, Thayer's argument that Officer Reed was not qualified to answer the municipality's questions on cross-examination is not convincing.