Laura A. BLANK, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6541.

Court of Appeals of Alaska.

May 19, 2000.

---

Christine S. Schleuss, Suddock & Schleuss, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

STEWART, Judge.

Laura A. Blank struck a pedestrian, Pennye McDowell, while driving home from a friend's house. Blank did not stop at the scene of the accident. McDowell died from her injuries.

The Alaska State Troopers investigated the accident and ultimately arrived at Blank's residence. During an interview with Blank in his patrol car, Trooper Bill D. Tyler performed a portable breath test on Blank that yielded a result of .082. The grand jury indicted Blank for manslaughter[1] and felony leaving the scene of an injury accident.[2] Blank moved to suppress her interview with Trooper Tyler, claiming that it was custodial interrogation without *Miranda*[3] warnings. Blank also claimed that the portable breath test was an unauthorized search. Finally, Blank moved to suppress the evidence obtained from the service of two search warrants. Blank claimed that the warrants were based on illegally obtained evidence and on material misstatements of fact by the trooper

---

1. AS 11.41.120(a).

2. AS 28.35.060(a).

3. *See Miranda v. Arizona,* 384 U.S. 436, 443–44, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

who applied for the warrants. Superior Court Judge Beverly W. Cutler denied Blank's motions.

Because we agree with Blank that the portable breath test was an unauthorized search, we reverse.

*Facts and proceedings*

On September 26, 1994, Pennye McDowell and Diane Forster were walking on a residential street in a subdivision near Palmer. The paved roadway, edged with a narrow gravel strip, was straight and level. Forster walked on the gravel strip; McDowell on the edge of the road bed. Blank drove up from behind the two and struck McDowell. McDowell's body landed several feet away in a ditch. The impact broke the windshield, the right side view mirror, and the right side passenger's window of Blank's car. Blank did not stop; Forster testified that she "heard the car squealing around the corner" away from the scene.

Blank's husband, Greg Blank, appeared at the scene while troopers were investigating. Mr. Blank told Trooper Tyler that his wife may have been involved in the accident. Tyler and two other officers followed Mr. Blank back to the Blank residence. At the residence, Tyler introduced himself to Laura Blank and told her that he "needed to talk to her about the accident." Tyler suggested that his patrol car was a better place for the interview and Blank went with Tyler to the patrol car.

During the interview, Blank told Tyler that she had two beers at a friend's house before driving home. Tyler administered a portable breath test that registered a blood-alcohol content of .082%. Blank agreed to go to the hospital to have a blood test, but changed her mind at the hospital. Tyler did not arrest Blank.

On September 29, 1994, Trooper Dale G. Gibson, relying on information from Tyler, obtained a search warrant to inspect Blank's car which had been impounded. On October 14, 1994, Tyler obtained a second search warrant for an additional inspection of the car. Blank's indictment for manslaughter and leaving the scene of an injury accident followed.

Judge Cutler denied Blank's pretrial motions to suppress the portable breath test result, the statement to Trooper Tyler and the evidence obtained from the execution of the search warrants. Following a mistrial, Blank was convicted on both counts at her second trial. Judge Cutler imposed a 6–year sentence with 1 year suspended for manslaughter and a suspended 2½-year consecutive term for leaving the scene of the accident. Blank now appeals her conviction.

*Discussion*

*Was Tyler's interview custodial interrogation?*

When Tyler arrived at Blank's residence, he introduced himself to Blank and told her that he "needed to talk to her about the accident." Tyler asked Blank: "Why don't you come and sit in my car[?]" Blank accompanied Tyler out to his patrol car, which was parked outside the residence, and sat in the front seat.

Tyler recorded the interview with Blank. At the start, Tyler stated that the interview was being conducted in the patrol car "only for convenience sake" and expressed concern about "the kids getting involved." Tyler advised Blank that "you're not under arrest or anything like that" and that "you're free to leave any time you want to." Blank answered Tyler's questions during the approximately hour-long interview. Towards the end, Tyler asked, "were you[ ] coerced, promised anything, ... forced to make a statement or anything?" Blank answered "no" and offered another detailed recital of events. Tyler returned to his question:

TYLER: Were you forced to make a statement?

BLANK: No.

TYLER: Okay, you're doing this on your own free will?

BLANK: You bet. You bet.

Blank agreed to accompany Tyler to the hospital for a blood test.

After hearing evidence on Blank's motion to suppress the statements she made during

the interview with Tyler, Judge Cutler found that a reasonable person would not have thought she was in custody, and found that Blank subjectively understood she was not in custody during the interview. As support for finding that a reasonable person would not have thought they were in custody, Judge Cutler noted that police "routinely" interview drivers in a patrol car after an accident. Judge Cutler found that the length of the interview and the small number of officers present at the Blank residence were not indicative of a custodial interview. As for the interview's location in the patrol car, Judge Cutler saw the patrol car as an alternative private location. The judge found important the fact that, although Tyler suggested the patrol car as a location for the interview, it was Mr. Blank who brought the police back to the residence.

In *Hunter v. State*,[4] the Supreme Court adopted an objective test for deciding if a person was in custody, so that *Miranda* warnings were required. *Miranda* warnings must precede police interrogation conducted under circumstances in which a "reasonable person would feel he was not free to leave and break off the questioning."[5] The Supreme Court further indicated that:

> At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or

escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.[6]

Blank has not attacked Judge Cutler's findings regarding these factors. However, Blank claims that Judge Cutler erred by concluding from her findings that Blank was not in custody.

Our review of the record convinces us that Judge Cutler did not err in determining that a reasonable person in Blank's position "would have felt free to break off the questioning."[7] The interview was conducted in Tyler's patrol car outside of Blank's residence. Although there were two other troopers at Blank's property, they were not in Tyler's patrol car during the interview. Tyler told Blank that she was free to go and was not under arrest, nor was Blank arrested that day. For purposes of *Miranda* we agree with Judge Cutler's decision that Blank was not in custody during the interview with Tyler.

*Was Blank's statement voluntary?*

Blank also moved to suppress her statement to Tyler, arguing that it was involuntary. Judge Cutler denied that motion as well. We review the superior court's determination that Blank's statement was voluntary by examining the totality of the circumstances surrounding the statement.[8] We accept the superior court's findings of historical fact unless they are clearly erroneous; but we review the record and make an independent determination of Blank's mental state and its legal significance.[9] Factors that we consider in deciding if the State has met its burden of showing that a defendant's statement is voluntary include the defendant's age, mental status, and prior criminal experience; the length, intensity, and fre-

---

**4.** 590 P.2d 888 (Alaska 1979).

**5.** *Id.* at 895.

**6.** *Id.*

**7.** *Id.*

**8.** *See State v. Ridgely,* 732 P.2d 550, 554 (Alaska 1987).

**9.** *See Id.* at 554; *Troyer v. State,* 614 P.2d 313, 318 (Alaska 1980).

quency of the questioning; the presence of physical deprivation or mistreatment; and the existence of threat or inducement.[10]

The record shows the following. When Tyler questioned Blank, she was thirty. She was married and had three children. She was upset about the accident. She had no known prior criminal history or experience. Tyler questioned Blank in one interview that was less than one hour long. There is nothing in the record that shows any deprivation or mistreatment. Nor is there any indication of a threat or an improper inducement. Blank argues that her will was overborne because the trooper did not inform her that McDowell was killed. But Tyler did not provide any false information or create any false impressions. He merely withheld information. After reviewing the totality of the circumstances in the record before this court, we conclude, as did the superior court, that the State sustained its burden of proving that Blank's will was not overborne and that her statement was voluntary.

*Were the search warrants issued on material misstatements of fact?*

The troopers seized Blank's car and took it to an impound yard in Palmer. On September 29, 1994, Trooper Dale G. Gibson applied for a warrant to search Blank's car based on his investigation and reports from Trooper Tyler. In support of the application, Gibson testified before Magistrate David L. Zwink. Magistrate Zwink found probable cause to issue the warrant. On October 14, 1994, Trooper Tyler applied for a second warrant to conduct an additional inspection of the car. District Court Judge Peter G. Ashman issued that warrant.

Blank moved to suppress the evidence obtained when the troopers served the warrants. Blank claimed that Trooper Gibson made material misstatements when applying for the first warrant. Blank also claimed that Gibson should have told the court that Blank reported consuming two beers and did not show signs of intoxication other than the odor of alcohol and "mood swings." Blank argues that the omission of this information was a material misstatement. Blank also faults Trooper Gibson for stating that there was no known reason for Blank to leave the scene of the accident and no reason for failing to avoid hitting McDowell. Blank argues these were material misstatements of fact.

Because Blank told Trooper Tyler that she was not aware that she might have struck anyone until she saw the blood on her car, she argues that Gibson's statement that she had no reason to leave the scene was a material misstatement. Also, because Blank told Trooper Tyler that she thought she had driven around the pedestrians with enough room, Blank argues that Trooper Gibson's statement that she had no reason for failing to avoid McDowell was a material misstatement.

The parties agree that Blank's claims are governed by *State v. Malkin*.[11] In *Malkin*, our supreme court adopted the rule established by the U.S. Supreme Court in *Franks v. Delaware*:[12] that intentional or reckless misstatements or omissions must be excised from an application for a search warrant.[13] Once the offending items are excised, the remainder of the application for a search warrant is scrutinized for probable cause and the warrant will be upheld if probable cause exists.[14] However, if the misstatements or omissions were deliberately made and calculated to mislead the magistrate, the warrant is invalidated and the evidence suppressed.[15] A misstatement or omission is material if essential to the probable cause determination.[16]

---

**10.** *See Sovalik v. State*, 612 P.2d 1003, 1006 (Alaska 1980).

**11.** 722 P.2d 943 (Alaska 1986).

**12.** 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

**13.** *See Malkin*, 722 P.2d at 946 (*citing Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674).

**14.** *See id.*

**15.** *See id.* at 946 n. 6.

**16.** *See Davenport v. State*, 515 P.2d 377, 380 (Alaska 1973).

Judge Cutler heard Trooper Gibson's testimony on this claim at an evidentiary hearing. She found that Gibson had not deliberately omitted information when he testified in support of the warrant. Gibson learned of Blank's statements from Tyler's reports. From our review of the record, Judge Cutler's findings are not clearly erroneous. Furthermore, the record establishes that there was probable cause to issue a search warrant and nothing Blank points to is a material omission that would defeat the issuance of a warrant.

Judge Cutler also found that Trooper Gibson had not been deliberate or reckless when Gibson said that Blank had no reason for leaving the scene of the accident or for failing to avoid hitting McDowell. Furthermore, Judge Cutler concluded that those statements were not material to the issuance of the search warrant. Judge Cutler found that none of Gibson's purported misstatements or omissions were reckless or intentional. The record supports Judge Cutler's findings. We conclude that the superior court did not err in failing to suppress the evidence from the first search warrant.

Blank advances similar arguments in support of her challenge to the second search warrant for the car. The car had been in the continuous custody of the troopers since the investigation began. Because of that continuous custody, it is questionable if a warrant was required to subject the car to additional testing. In *State v. McDonald*,[17] we quoted LaFave, *Search and Seizure*, for the settled principle that:

> [a]n object lawfully seized as evidence may be kept in custody pending trial, and during that period "it is plainly within the realm of police investigation to subject [such an object] to scientific testing and examination" when such is done "for the purpose of determining its evidentiary value." That is, if the initial seizure was upon probable cause that the item would be of

evidentiary value, it may be tested and examined for the purpose [of] maximizing its value in this respect.[18]

Even so, Judge Cutler considered Blank's motion and analyzed the evidence offered in support of the second warrant. Judge Cutler noted that the second warrant was "basically based on the first warrant" and denied Blank's motion for the same reasons that she denied the motion as to the first warrant. Even though the second warrant was probably not necessary, Judge Cutler's ruling on the second warrant can be affirmed for the same reasons that we affirmed her decision on the first warrant—the record supports her findings that none of the purported misstatements or omissions were reckless or intentional.

■ Finally, Blank argues that the evidence obtained from the search warrants should be suppressed because the portable breath test was an illegal search. However, if illegally obtained evidence is included in an application for a search warrant, we do not invalidate the warrant if the warrant could have been issued on the basis of the untainted evidence in the application.[19]

■ Both search warrant applications in this case included evidence that Blank struck and killed McDowell while driving her car and did not stop at the scene of the accident. Her car suffered extensive and noticeable damage. The road was straight and level with no visual obstructions. McDowell and her companion were walking along the side of the road when McDowell was struck during daylight hours. Even without the result of the portable breath test, this evidence provided probable cause to believe that Blank committed felony leaving the scene of an injury accident, manslaughter, or criminally negligent homicide. Thus, the portable breath test result was not material to the issuance of the warrants.

---

17. 872 P.2d 627 (Alaska App. 1994).

18. *Id.* at 642 (*quoting* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 7.5(c) (3d ed. 1996) (*quoting People v. Teale*, 70 Cal.2d 497, 75 Cal.Rptr. 172, 450 P.2d 564 (1969))) (other footnotes omitted).

19. *See Schmid v. State*, 615 P.2d 565, 575 (Alaska 1980); *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994).

*Was the portable breath test an authorized search?*

█ In a criminal investigation, a breath test for alcohol is a search.[20] In *Leslie v. State*,[21] we held that a police officer could administer a preliminary breath test under AS 28.35.031(b) only if the officer had probable cause to believe that the driver's ability to operate a motor vehicle was impaired by alcohol.[22]

Here, Trooper Tyler had evidence that Blank left the scene of an injury accident that caused substantial and visible damage to her car. Tyler also knew that McDowell had died from her injuries. But, although there was probable cause to believe that Blank committed a crime, the State does not contend that the police had any individualized suspicion that Blank's "ability to operate a motor vehicle [was] impaired by the ingestion of alcoholic beverages[.]"[23] Moreover, the record would not support that conclusion. The record shows that Trooper Tyler noticed the odor associated with alcohol consumption, and that Blank stated that she consumed two beers at her friend's house. But the State has not identified any other evidence that Blank was impaired by alcohol.

Rather than relying on AS 28.35.031(b) as authority for the portable breath test, the State relies on AS 28.35.031(g) which provides as follows:

> A person who operates or drives a motor vehicle in this state shall be considered to have given consent to a chemical test or tests of the person's breath and blood for the purpose of determining the alcoholic content of the person's breath and blood and shall be considered to have given consent to a chemical test or tests of the person's blood and urine for the purpose of determining the presence of controlled substances in the person's blood and urine

if the person is involved in a motor vehicle accident that causes death or serious physical injury to another person. The test or tests may be administered at the direction of a law enforcement officer who has reasonable grounds to believe that the person was operating or driving a motor vehicle in this state that was involved in an accident causing death or serious physical injury to another person.

On its face, subsection (g) by stating that "[t]he test or tests may be administered at the direction of a law enforcement officer[,]" gives a police officer the discretion to test any driver or operator of a motor vehicle involved in an accident where someone else receives serious physical injuries or is killed. Apparently, the statute allows the officer to administer the test(s) without any individualized suspicion that the driver was impaired, whether by alcohol or drugs, or even any evidence that the driver or operator caused the accident.

In a series of cases, the Supreme Court has decided that a limited group of searches without individualized suspicion that are authorized by statute or regulation, are reasonable searches under the Fourth Amendment and are based on "special needs, beyond the normal need for law enforcement[.]"[24] The State argues that Blank's breath test can be justified under this "special needs" exception.

In *Skinner v. Railway Labor Executives' Ass'n*,[25] the Supreme Court approved government-mandated blood and breath tests by railroad companies for those employees who were involved in serious accidents or had violated certain safety rules.[26] The Court ruled that these searches were reasonable under the Fourth Amendment even though there was no suspicion of individualized wrongdoing. As the Court stated in *Skinner*:

---

**20.** *See Burnett v. Municipality of Anchorage*, 678 P.2d 1364, 1368 (Alaska App.1984); *Burnett v. Municipality of Anchorage*, 806 F.2d 1447, 1449 (9th Cir.1986).

**21.** 711 P.2d 575 (Alaska App.1986).

**22.** *Id.* at 577.

**23.** AS 28.35.031(b).

**24.** *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (quotations and citations omitted):

**25.** *Id.*

**26.** *Id.* at 608–13, 109 S.Ct. 1402.

In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.[27]

Because the railroad employees worked in a highly regulated industry, the Court balanced the employees' diminished expectation of privacy against the government's interest in ensuring the safety of an industry where the employees, like those in the nuclear industry, can cause "great human loss" when "a momentary lapse of attention can have disastrous consequences."[28]

When "special needs" are advanced as a justification for a Fourth Amendment intrusion, the Court undertakes a context-specific inquiry, examining the competing private and public interests.[29] In *National Treasury Employees Union v. Von Raab*,[30] the Court reviewed and approved a Customs Service rule that mandated drug testing for any employee taking a position that involved direct contact with drug intervention or required the employee to carry a firearm.[31] There, the Court decided that the country's interest in avoiding the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life of the citizenry outweighed the limited privacy interests of employees who had a diminished expectation of privacy because of the "special, and obvious, physical and ethical demands of [their] positions."[32] The Court

therefore held that the searches were reasonable under the Fourth Amendment.[33]

In *Vernonia School Dist. 47J v. Acton*,[34] the Court approved a random drug-testing program for students participating in extracurricular sports programs.[35] The school district imposed that program in the face of problems at school caused by wide spread drug use among the students where the "athletes were the leaders of the drug culture."[36] Balanced against this concern (a concern that the Court described as "important—indeed, perhaps compelling"[37]) were (1) the athletes' reduced expectation of privacy in general because they were students and schools regularly exercise their custodial responsibility for the children with examinations for physical and medical problems; and (2) the even lower expectation of privacy that a school athlete has because of the athlete's less than private experiences in the locker room.[38] Also, the Court noted that the testing program was relatively unobtrusive (and confidential). The Court balanced three factors in its analysis: the nature of the privacy interest which the search intrudes,[39] the character of the intrusion,[40] and the nature and the immediacy of the government's concern and the efficacy of the means for meeting it.[41] Balancing these three factors, the *Acton* Court declared that the school district policy requiring athletes to consent to random drug testing before participating in extracurricular athletic programs was reasonable under the Fourth Amendment.[42]

The governor's transmittal letter for the bill from which AS 28.35.031(g) arose shows that the subsection was designed for direct

---

27. *Id.* at 624, 109 S.Ct. 1402.

28. *Id.* at 628, 109 S.Ct. 1402.

29. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

30. *Id.*

31. *Id.* at 660–65, 109 S.Ct. 1384.

32. *Id.* at 679, 109 S.Ct. 1384.

33. *Id.*

34. 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

35. *Id.* at 664–666, 115 S.Ct. 2386.

36. *Id.* at 649, 115 S.Ct. 2386.

37. *Id.* at 661, 115 S.Ct. 2386.

38. *Id.* at 656–57, 115 S.Ct. 2386.

39. *Id.* at 654–57, 115 S.Ct. 2386.

40. *Id.* at 658–60, 115 S.Ct. 2386.

41. *Id.* at 660–64, 115 S.Ct. 2386.

42. *Id.* at 664–66, 115 S.Ct. 2386.

law enforcement. ("This proposed legislation gives police and prosecutors the tools they need ..."[43]) This subsection abandons any requirement of individualized suspicion that a driver is impaired and permits the search, at the discretion of a police officer, of any driver involved in an accident where someone else suffers serious injury.

A suspicionless search program implemented for normal law enforcement, the apparent purpose of AS 28.35.031(g), does not meet the Supreme Court's "special needs" balancing test. In the cases discussed above, the Supreme Court pointed out that the suspicionless searches at issue served special societal needs other than normal law enforcement.[44] Subsection (g) addresses normal law enforcement. Even if normal law enforcement was not the apparent purpose of subsection (g), the statute would have to meet the Supreme Court's balancing test. That test requires a "context-specific inquiry, examining closely the competing private and public interests advanced by the parties."[45] And in *Skinner*, the Court stated: "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion."[46]

In the circumstances of this case, normal law enforcement needs would not be jeopardized by requiring the government to have individualized suspicion before subjecting a person to a breath test. Although a driver involved in an accident where someone else is seriously injured can reasonably expect that police would investigate the accident, the expectation of an investigation does not lessen a driver's expectation of privacy. Certainly, a portable breath test is relatively unobtrusive, particularly when compared to a seizure of blood. However, the need to supply the police and prosecutors with an additional tool for law enforcement that does not require individualized suspicion does not appear great. Having considered the three factors from the Supreme Court's analysis in *Acton*, we conclude that AS 28.35.031(g) permits unreasonable intrusions contrary to the Fourth Amendment.

We also reach the same conclusion under article I, section 14 of the Alaska Constitution. The Alaska Constitution restricts the legislature's authority to permit searches without a warrant.[47] Article I, section 14 provides broader protection than the Fourth Amendment, especially when it is construed together with the right to privacy provision of article I, section 22.[48]

We asked for additional briefing on whether the search of Blank's breath would have been permitted under the Fourth Amendment if the police had probable cause to believe that Blank committed a crime. In its response, the State suggests that Fourth Amendment concerns with the statute could be avoided if we construe AS 28.35.031(g) to require that the police have probable cause to believe that the tested driver has committed a crime, here vehicular homicide and hit and run. We recognize that a statute can be construed in a manner that does not raise constitutional concerns.[49]

However, the State's proposed construction of the statute overlooks *Layland v. State*.[50] Layland was receiving treatment at

**43.** 1994 House Journal 2262–64.

**44.** *See Skinner*, 489 U.S. at 619, 109 S.Ct. 1402; *Von Raab*, 489 U.S. at 665, 109 S.Ct. 1384; *Vernonia*, 515 U.S. at 653, 115 S.Ct. 2386; *Chandler v. Miller*, 520 U.S. 305, 313–14, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).

**45.** *Chandler*, 520 U.S. at 314, 117 S.Ct. 1295.

**46.** *Skinner*, 489 U.S. at 624, 109 S.Ct. 1402.

**47.** *See Woods & Rohde, Inc. v. Alaska Dep't of Labor*, 565 P.2d 138, 150–52 (Alaska 1977) (striking down a statute that authorized warrantless inspections of workplaces because it violated article I, section 14 of the Alaska Constitution).

**48.** *See State v. Ricks*, 816 P.2d 125, 127 (Alaska 1991); *Rohde*, 565 P.2d at 150–51.

**49.** *See Kenai Peninsula Borough v. Cook Inlet Region, Inc.*, 807 P.2d 487, 498 (Alaska 1991).

**50.** 535 P.2d 1043 (Alaska 1975), *overruled on other grounds by Anchorage v. Geber*, 592 P.2d 1187, 1191–92 & n. 8 (Alaska 1979).

a hospital for his own injuries from a motor vehicle accident where another individual was killed. The police asked Layland for his consent to obtain a blood sample. Layland declined that request. Although the police had probable cause to arrest Layland for negligent homicide arising out of the accident, they did not arrest him. Instead, the police seized a blood sample from Layland without a warrant. Our supreme court held that the warrantless seizure of Layland's blood was unconstitutional under both the federal and the state constitutions.[51]

In *Schmerber v. California*,[52] the Supreme Court held that a warrant was not required to seize blood from a driver under arrest for driving while intoxicated.[53] On first blush, it appeared that the Supreme Court held that the search was justified because it was incident to Schmerber's arrest. Besides the seeming requirement of an arrest, the Supreme Court required that the police have "clear indication" that the seizure of blood would provide evidence, and required that the police reasonably believe that there was an emergency because the evidence would be lost if the search was delayed for the time needed to obtain a warrant.[54] In *Layland*, the Alaska Supreme Court followed *Schmerber* and interpreted the Alaska search and seizure clause, article I, section 14, to permit a warrantless seizure of blood only if a suspect had been arrested and only if there were exigent circumstances justifying the search.[55]

But later cases cast doubt on our supreme court's interpretation of *Schmerber*. It now appears that the Fourth Amendment permits a warrantless search of a suspect who has not been arrested if the police have (1) probable cause to believe that the suspect committed a crime; (2) probable cause to believe that a search of the suspect's person would produce evidence; and (3) there are exigent circumstances requiring immediate action. In *Cupp v. Murphy*,[56] the Supreme Court approved the warrantless seizure of scrapings from under a suspect's fingernails. The suspect was not under arrest and was not arrested after the police completed the search. The Court assumed that there was probable cause that the suspect had committed a homicide by strangling the victim with his hands and found that exigent circumstances justified the immediate seizure of the fingernail scrapings because the suspect had been alerted to the police interest in the evidence and the evidence may have been destroyed if the police did not act.[57] Furthermore, in *Winston v. Lee*,[58] the Supreme Court discussed *Schmerber* and stated: "Because [*Schmerber*] fell within the exigent-circumstances exception to the warrant requirement, no warrant was necessary." [59] No mention was made in *Winston* that an arrest was required. And, in *U.S. v. Chapel*,[60] an *en banc* panel of the Ninth Circuit held that the Fourth Amendment does not require the police to arrest a motorist suspected of driving while intoxicated before the motorist's blood could be seized without a warrant. As long as the warrantless seizure meets the other requirements of *Schmerber* ((1) the police must have probable cause to believe that the suspect was driving while intoxicated; (2) the police must reasonably believe there is an emergency in which the delay in obtaining a warrant threatens the loss of evidence; (3) the procedure to obtain the evidence must be reasonable), the seizure is authorized under the Fourth Amendment.[61]

51. *Layland*, 535 P.2d at 1044–45 & 1050.

52. 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

53. *Id.* at 771–72, 86 S.Ct. 1826.

54. *Id.* at 770–71, 86 S.Ct. 1826.

55. *See Layland*, 535 P.2d at 1045, 1048–49.

56. 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973).

57. *Id.* at 296, 93 S.Ct. 2000.

58. 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

59. *Id.* at 759, 105 S.Ct. 1611.

60. 55 F.3d 1416 (9th Cir.1995).

61. *See id.* at 1418–19.

This approach is endorsed by Professor LaFave in his treatise on the Fourth Amendment:[62] "[T]he better view is ... that a 'warrantless search is proper if the officer had probable cause to believe that a crime had been committed and probable cause to believe that evidence of the crime in question will be found' and that 'an immediate, warrantless search is necessary in order to ... prevent the destruction or loss of evidence.' "[63]

 Nonetheless, although the Fourth Amendment may not require an arrest before the warrantless seizure of evidence from a suspect in Blank's circumstances, our supreme court in *Layland* ruled that article I, section 14 of the Alaska Constitution does require that formality.[64] The court reasoned as follows:

> In our view, strict adherence to the substantially contemporaneous arrest requirement ensures to persons suspected of driving under the influence of alcohol protection from arbitrary denials of their right of privacy. Adherence to the substantially contemporaneous arrest prerequisite provides some measure of assurance that probable cause is based upon considerations independent of the blood-alcohol test results.[65]

Professor LaFave maintains that our court's concern is "untenable, as the need for a court to determine that probable cause existed prior to the test is present under either rule."[66] Even so, the *Layland* court concluded that the warrantless seizure of Layland's blood could not be justified under the exigent-circumstances exception to the warrant requirement.[67] We are bound to follow the decisions of our supreme court.[68] Because Blank was not under arrest when she was searched, the portable breath test result was obtained con- trary to article I, section 14 of the Alaska Constitution.

 The State argues that because the portable breath test was obtained in good faith compliance with the dictates of the statute, suppression is not an appropriate remedy even if the statute is unconstitutional because the police complied with the direction of the statute.[69] But this argument is unconvincing. The statute did not mandate testing. Rather, it gave the police discretion to test a driver who was involved in an accident where someone else was seriously injured ("[t]he test or tests may be administered at the direction of a law enforcement officer ...."[70]).

 The State argues that the failure to arrest Blank was harmless beyond a reasonable doubt because the record establishes that the police could have arrested Blank when the portable breath test was administered. However, we have ruled that the evidence was inadmissible under *Layland.* The State argued to the jury that Blank's blood alcohol level as shown by the portable breath test was relevant evidence to meet the burden of proof for both manslaughter and failure to render assistance. The State claimed that Blank's blood alcohol level showed that Blank was impaired and that her impairment affected her ability to perceive the risk caused by her conduct. As instructed, the jury could find that the State met its burden of proof on the mental state for each crime charged by showing that Blank failed to perceive the risk of her conduct because of her impairment. The State additionally presented expert testimony on the rate that alcohol was absorbed and metabolized, allowing inferences to be drawn from the alcohol level at the time of the portable breath test.

---

**62.** *See* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 5.4(b), at 155–63 (3d ed.1996).

**63.** *Id.* at 160–61 (footnotes omitted).

**64.** *See Layland,* 535 P.2d at 1048–50; *Municipality of Anchorage v. Ray,* 854 P.2d 740, 749–50 (Alaska App.1993).

**65.** *Layland,* 535 P.2d at 1049.

**66.** 3 Wayne R. LaFave, *Search and Seizure,* § 5.4(b), at 162.

**67.** *Layland,* 535 P.2d at 1050.

**68.** *See Harrison v. State,* 791 P.2d 359, 363 (Alaska App.1990).

**69.** *See Illinois v. Krull,* 480 U.S. 340, 350, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987).

**70.** *See* AS 28.35.031(g).

The State also presented expert testimony regarding the influence of alcohol on cognitive and physical functions at various blood alcohol levels and evidence of a consensus in the scientific community that a person with a .08 level is too impaired to drive. Finally, the State used the .082 breath test result to attack Blank's credibility by presenting expert testimony that she could not have consumed only two beers as she reported to Trooper Tyler and obtained a .082 portable breath test result, but that she would have to have had four times the amount of beer that she reported to obtain that result. We cannot conclude that the use of the portable breath test result was harmless. Therefore, Blank's convictions must be reversed because Blank's breath test was illegally obtained and admitted at her trial.

*Conclusion*

The judgment of the superior court is REVERSED.

MANNHEIMER, Judge, dissenting.

I agree with my colleagues that the breath test result must be suppressed. The trooper who administered the test to Blank had probable cause to believe that Blank had committed two crimes: manslaughter and felony hit-and-run. The trooper also had probable cause to believe that the alcohol in Blank's breath (or, conversely, the absence of alcohol in her breath) would be evidence relevant to these crimes. But in *Layland v. State* [1], the Alaska Supreme Court ruled that the existence of probable cause does not authorize a search of a motorist's breath or blood unless the motorist is arrested. As Judge Stewart explains in the majority opinion, it appears that *Layland* is based on a misinterpretation of the United States Supreme Court's decision in *Schmerber v. California*.[2] Even so, we are bound by *Layland*.

But though I agree that the breath test result must be suppressed, I disagree with my colleagues concerning the effect of this error on Blank's convictions. Blank was con-

victed of two crimes: manslaughter and felony hit-and-run (leaving the scene of an injury accident). Suppression of the breath test evidence requires reversal of Blank's manslaughter conviction, but it does not require reversal of Blank's hit-and-run conviction.

In arguing that Blank was guilty of manslaughter, the prosecutor relied heavily on the breath test result. He argued that the test result showed that Blank had been drinking more than the one beer she admitted. He also urged the jury to infer that Blank's consumption of alcohol had affected her concentration and attentiveness while driving—that it had been a factor in causing the accident.

But when the prosecutor argued that Blank was guilty of hit-and-run, he paid almost no attention to Blank's consumption of alcohol and her possible intoxication. The prosecutor did not argue that Blank was too drunk to understand that she had hit someone.[3] Rather, the prosecutor argued that the circumstances of the collision and the actions Blank took following the collision clearly demonstrated that Blank was aware that she had struck someone.

The prosecutor pointed out that Blank's vehicle struck Pennye McDowell so hard that the impact cracked the windshield, broke off the side-view mirror, and smashed out the front passenger window. He reminded the jury that one of Blank's children testified that, a few moments after the collision, Blank asked, "Did I hit somebody?", and her daughter Tori replied that she thought they had hit someone.

But despite her daughter's answer, Blank drove away from the scene—and she drove away fast. The prosecutor asked the jury to remember the testimony given by a boy who was playing in a neighboring yard. The boy testified that he heard the collision and then, immediately afterward, he heard a woman (McDowell's friend) crying "Help, help!", and then he heard the sound of tires squealing.

---

**1.** 535 P.2d 1043, 1047–49 (Alaska 1975).

**2.** 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

**3.** See AS 11.81.900(a)(2), which allows the State to prove the culpable mental state of "knowingly" by proving that the defendant would have known of the relevant circumstance but for the defendant's intoxication.

Blank accelerated away from the scene of the collision and (in the prosecutor's words) "made a bee-line ... to her house". She drove over ruts and boulders, wedging rocks in the undercarriage of her car. When she arrived, she put her car in the garage and closed the garage door so that the car could not be seen.

In short, the jury's decision to convict Blank of felony hit-and-run did not depend on a finding that Blank was intoxicated (or even that she had been drinking). The prosecutor argued that, intoxicated or not, Blank understood that she had struck someone. Her vehicle had suffered obvious damage, and her own daughter told her that she thought they had hit somebody. Despite this, Blank did not stop to find out what had happened; instead, she drove away at high speed without looking back.

Given this evidence, and given the way the prosecutor argued the case, there is no reasonable possibility that the jury's hit-and-run verdict was affected by the breath test evidence.[4] I would therefore affirm Blank's hit-and-run conviction.

---

**4.** *See Love v. State,* 457 P.2d 622, 629–631 (Alaska 1969) (the improper admission of evidence at a criminal trial does not require reversal of a conviction unless the evidence substantially influenced the jury's decision).