Laura A. BLANK, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9034.

Court of Appeals of Alaska.

Sept. 1, 2006.

Christine S. Schleuss, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

Laura A. Blank struck a pedestrian, Pennye McDowell, inflicting fatal injuries, and drove away from the scene. Soon thereafter, an Alaska State Trooper arrived at Blank's home to investigate. While the trooper and Blank sat in his patrol car discussing the situation, the trooper asked Blank to blow into an instrument described as a portable breath test. Blank did so, and the results of the test were admitted at her trial for manslaughter and felony leaving the scene of an accident.[1] The jury convicted Blank as charged.

In this appeal, we consider Blank's remaining attacks on the superior court's admission of the results of this breath test and reject them. Accordingly, we affirm Blank's conviction.

*Background facts and the procedural history of this case*

On September 26, 1994, McDowell and a friend, Diane Forster, were walking on a residential street in a subdivision near Palmer when Blank drove up from behind and struck McDowell. McDowell died from her injuries. Blank did not stop.

Blank's husband, Greg Blank, appeared at the scene while troopers were investigating.

Mr. Blank told Trooper Bill D. Tyler that Mr. Blank's wife may have been involved in the accident. Tyler and two other officers followed Mr. Blank back to the Blank residence. At the residence, Tyler introduced himself to Laura Blank and suggested she talk with him in his patrol car.

Blank told Tyler that she had two beers at a friend's house before driving home. Tyler asked Blank to take a breath test on the portable device he had in the patrol car. She agreed, and the test resulted in a reading that Blank had a blood-alcohol content of .082%. Tyler did not arrest Blank.

In our first opinion in this case, we held that the breath test was unconstitutional because AS 28.35.031(g) did not require individualized suspicion that the driver had committed a crime.[2] We also ruled that, under the Alaska Supreme Court's opinion in *Layland v. State,*[3] the breath test was inadmissible.[4] The Alaska Supreme Court reversed our ruling, holding that the breath test was authorized by AS 28.35.031(g). The supreme court construed the statute to require probable cause and the existence of exigent circumstances.[5] Also, the court overruled *Layland.*[6] The supreme court remanded to the superior court to decide whether exigent circumstances existed to justify Trooper Tyler's search in Blank's case.[7]

On remand, Judge Cutler found exigent circumstances existed to justify the admission of the portable breath test. Blank does not dispute the superior court's finding that exigent circumstances existed. Rather, Blank raises the issue of whether the admission of the results of the portable breath test is barred by statute.

*Discussion*

Blank frames the appeal in two questions: first, is a breath test on a portable device

1. AS 11.41.120(a) & AS 28.35.060(a), respectively.

2. *Blank v. State,* 3 P.3d 359, 366 (Alaska App. 2000).

3. 535 P.2d 1043 (Alaska 1975), *overruled on other grounds by Anchorage v. Geber,* 592 P.2d 1187, 1191–92 & n. 8 (Alaska 1979).

4. *See Blank,* 3 P.3d at 370.

5. *State v. Blank,* 90 P.3d 156, 161–64 (Alaska 2004).

6. *Id.* at 160–61.

7. *Id.* at 162–64.

exclusively a "preliminary breath test" as that test is described in AS 28.35.031(b)? Second, if a breath test on a portable device is a "preliminary breath test," is its evidentiary use limited to establishing probable cause for arrest?

Alaska's implied consent statute provides that a person operating a motor vehicle in Alaska is considered "to have given consent to a chemical test or tests of the person's breath for the purpose of determining the alcoholic content of the person's blood or breath[.]"[8] Usually, a person must be "lawfully arrested" before a person's duty to submit to testing under the implied consent statute is triggered.[9]

The statute specifies two situations in which a person impliedly consents to testing without an arrest. First, under subsection .031(b), an officer may give a "preliminary breath test" if the officer has "probable cause to believe that a person's ability to operate a motor vehicle" is impaired by alcohol and the person was involved in an accident.[10] Subsection (d) provides that the results of this preliminary breath test "may" be used to determine whether a driver should be arrested.[11]

Next, subsection .031(g) provides that, if a person is involved in a motor vehicle accident that "causes death or serious physical injury to another person," that person will be considered to have given consent to a "chemical test or tests of the person's breath and blood" to determine alcohol levels.[12] An officer is not required to arrest the person prior to the test conducted under subsection .031(g). The Alaska Supreme Court has interpreted subsection .031(g) to require probable cause to search and exigent circumstances.[13] Here, Judge Cutler found the test was admissible under subsection .031(g).[14]

AS 28.35.031 sets no explicit limit on the admissibility of different kinds of breath tests. AS 28.35.033(d) does provide that, when "a chemical analysis of breath or blood was performed according to approved methods by a person trained according to techniques, methods, and standards of training approved by the Department of Public Safety, there is a presumption that the test results are valid and further foundation for introduction of the evidence is unnecessary." And AS 28.35.033(c) specifies that, except for a proviso not relevant in this case, the statutory presumptions that arise from evidence of a person's alcohol level "may not be construed to limit the introduction of any other competent evidence bearing upon the question of whether the person was or was not under the influence of intoxicating liquor."

 Blank asserts that a breath test on a portable device is synonymous with a preliminary breath test, and therefore, the test she performed in Trooper Tyler's patrol car could only be a "preliminary breath test." In addition, Blank argues that the statute implicitly limits the admissibility of preliminary breath tests (performed with portable devices) to establishing probable cause for arrest.

Blank bases her assertion regarding preliminary breath tests on a prior case involving the implied consent statute. In *Guerre–Chaley v. State*,[15] we noted that "Guerre–Chaley submitted to a 'preliminary breath test'—*i.e.*, a breath test on a portable testing device carried by the police officer."[16] Blank reads this language to mean that any test performed on a portable device is a "preliminary breath test" for purposes of the implied consent statute. The State argues that the language in *Guerre–Chaley* only indicates that the officer in that case used a portable device to conduct the preliminary breath test-not that any test administered on a portable device is exclusively a preliminary breath test under subsection (b).

**8.** AS 28.35.031(a).

**9.** *See* AS 28.35.031(a).

**10.** AS 28.35.031(b).

**11.** AS 28.35.031(d).

**12.** AS 28.35.031(g).

**13.** *Blank,* 90 P.3d at 162.

**14.** *Blank,* 90 P.3d at 159.

**15.** 88 P.3d 539 (Alaska App.2004).

**16.** *Guerre–Chaley,* 88 P.3d at 541.

In *Guerre–Chaley*, we used the terms "preliminary breath test," "preliminary breath test device," and "portable testing device" interchangeably. The device in question was a portable device, and the test in dispute was authorized under .031(b).[17] But the term "preliminary" used in subsection (b) refers to the timing of the test authorized under .031(b)—not the device on which the test is performed. Nor does it specify that a device used for a test under .031(b) can only be used for a "preliminary" test and no other purpose.

The statute does not otherwise define "preliminary." The common, ordinary meaning of "preliminary" specifies a temporal distinction. Thus, "preliminary" identifies the breath test by the time when the test is given (before arrest) but not the device used.[18]

In sum, Blank has not shown the statute provides that a breath test administered with a portable device is exclusively a "preliminary breath test;" nor has Blank identified legislative history that restricts the use of portable devices to preliminary tests under .031(b).

■ Blank notes that subsection .031(d) states that preliminary breath tests under subsection (b) "may be used by the law enforcement officer to determine whether the driver or operator should be arrested." Blank argues that, under the maxim *expressio unius est exclusio alterius*,[19] the designated use of the preliminary breath test for determining probable cause for arrest should be read as exclusive. While this principle is often a useful guide for statutory construction, it does not always apply, particularly

when the result of applying the principle appears contrary to the purpose of the statute.[20] The subsections of AS 28.35.031 all address circumstances under which a person has impliedly consented to a chemical test of one form or another. But the subsections of AS 28.35.031 do not restrict, or even address, the admissibility of relevant evidence under the evidence rules, and Blank has not shown any legislative history to that effect.

■ The next principle of statutory interpretation Blank employs is that all sections of a statute must be read in harmony so that each has meaning and none conflict.[21] Blank notes that the subsections dealing with preliminary breath tests were added to the implied consent statute in 1983, well after the statute was codified.[22] Blank claims that, if the legislature intended preliminary breath tests to be used for purposes other than establishing probable cause to arrest, it would have been unnecessary to add subsection (d) because "arrest determinations would necessarily be included in use as trial evidence."

But Blank has not shown any disharmony in the statute. As the State points out, before the statutory authorization of preliminary breath tests, any test authorized under the implied consent statute required that the testee first be arrested before the test could be administered.[23] As a result, a preliminary breath test may be useful for assisting an officer in deciding whether to arrest a suspect, and subsection (d) suggests as much. But the language in subsection .031(d) does not limit the use of a portable device to assisting decisions about whether to arrest

---

17. *Id.* at 544.

18. Webster's defines "preliminary" as "coming before or leading up to the main action, discussion, business, etc.; introductory; prefatory; preparatory." *Webster's New World College Dictionary* 1134 (4th ed.2001).

19. Literally, "the expression of one is the exclusion of another." *See Puller v. Anchorage*, 574 P.2d 1285, 1287 (Alaska 1978) ("The maxim establishes the inference that, where certain things are designated in a statute, 'all omissions should be understood as exclusions.' ") (quoting Sands Sutherland Statutory Construction, § 47.23 at 123 (4th ed.1973)).

20. *See Sonneman v. Hickel*, 836 P.2d 936, 939 (Alaska 1992).

21. *See Matter of Hutchinson's Estate*, 577 P.2d 1074, 1075 (Alaska 1978) ("It is an established principle of statutory construction that all sections of an act are to be construed together so that all have meaning and no section conflicts with another.").

22. *See* Ch. 83, § 1, SLA 1969; Ch. 77, § 16, SLA 1983.

23. Subsection (g) does not require arrest, but it was added in 1994, after subsection (b).

an individual. Although this may be a beneficial use for a portable device, the subsection does not provide that it is the only use for such a device.

Next, Blank argues that subsection .031(g) does not authorize a chemical test administered with a portable device. Specifically, Blank reasons that, because only one breath testing device was approved for evidentiary use at the time of Blank's incident (the Intoximeter 3000), subsection .031(g) did not authorize testing with other devices. Blank argues that, "while subsection .031(g) authorized Trooper Tyler to take Mrs. Blank in for a breath test on the Intoximeter 3000, it did not authorize a [portable breath test]." [24] Blank contends that, in promulgating subsection .031(g), the legislature did not intend to repeal the limits on the use of portable breath tests or intend their admission without the safeguards required for admission of other breath tests.

The legislature provided that the Department of Public Safety had the authority to evaluate and approve breath-test machines.[25] The result of a breath test is considered valid if "the chemical analysis ... shall have been performed according to methods approved by the Department of Public Safety." [26] But being a "valid" test only means that "further foundation for introduction of the evidence is unnecessary." [27] If Blank's breath test had been taken with an Intoximeter 3000, the results of the test could have been submitted into evidence under AS 28.35.033(d) without a further showing of validity because the Intoximeter 3000 was an approved device. But this does not mean that a different chemical test performed on another device is *not* admissible; it only means that tests on

other devices are subject to the normal rules of admissibility and reliability as required by the rules of evidence.[28]

We note here that Blank has not attacked Judge Cutler's ruling that the test result from the portable device was relevant and reliable evidence. This is in contrast to *Guerre–Chaley,* where the State objected to the use of the results of a breath test on a portable device because the reliability of that device had not been demonstrated.[29]

Approval of a specific test by the Department of Public Safety only affects whether that test enjoys a statutory presumption of validity under AS 28.35.033(d). It does not affect whether that test is admissible in court in general. The implied consent statute does not limit the use of portable breath test results to aiding in the decision whether to arrest a potentially intoxicated driver.

*Conclusion*

The judgment of the superior court is AFFIRMED.

COATS, Chief Judge, concurring.

MANNHEIMER, Judge, dissenting.

COATS, Chief Judge, concurring.

One of the questions this case presents is whether Trooper Tyler could lawfully require the defendant in this case, Laura Blank, to take a portable breath test. Superior Court Judge Beverly W. Cutler denied Blank's motion to suppress the results of the breath test, holding that AS 28.35.031(g) authorized Trooper Tyler to require Blank to take the breath test.[1]

---

**24.** This argument dovetails with Blank's arguments above that a test conducted on a portable device is necessarily a "preliminary breath test" and is only admissible to show probable cause to arrest.

**25.** AS 28.40.060.

**26.** AS 28.35.033(d).

**27.** AS 28.35.033(d). *See also Oveson v. Anchorage,* 574 P.2d 801, 804 (Alaska 1978) (noting that AS 28.35.033(d) allows a presumption that results of a valid test are valid without "any additional showing of foundational facts").

**28.** *See Wester v. State,* 528 P.2d 1179, 1181 (Alaska 1974) ("The Alaska legislature ... has specified the foundational facts necessary for admissibility of a chemical analysis of breath in AS 28.35.033(d). The statute, however, does not specify the method of proof of the foundational facts, which is controlled by the applicable rules of evidence.").

**29.** *See Guerre–Chaley,* 88 P.3d at 541.

**1.** AS 28.35.031(g) provides:

A person who operates or drives a motor vehicle in this state shall be considered to have

The statute appears to allow a broad array of tests, providing that the driver is considered "to have given consent to a chemical test or tests of the person's breath and blood for the purpose of determining the alcoholic content of the person's breath and blood and shall be considered to have given consent to a chemical test or tests of the person's blood and urine for the purpose of determining the presence of controlled substances in the person's blood and urine." The legislative policy set forth in the statute is consistent with allowing law enforcement officers to administer a portable test to a driver who is involved in an automobile accident that causes death or serious physical injury to determine if alcohol or drugs were involved. A driver who is involved in an injury accident may exhibit behavior that is consistent with being intoxicated. But the behavior may be due to injury rather than drugs or alcohol. A portable breath test would give an officer an opportunity to determine whether the behavior is a result of drugs, alcohol, or injury. Accordingly, the use of a portable breath test appears to be consistent with the policy set out by the legislature in the statute. I therefore conclude that Trooper Tyler's administration of the breath test was authorized by AS 28.35.031(g).

Whether the portable breath test results were admissible as evidence in Blank's trial is a separate question. To the best of my knowledge, courts have not found that portable breath tests, such as the one that Trooper Tyler used in this case, are admissible as valid scientific evidence.[2] But Blank concedes that she did not challenge the admissibility of the portable breath test on this ground. It is uncontested that Trooper Tyler had probable cause to believe that Blank was responsible for an accident resulting in a fatality and had probable cause to test Blank's breath.[3] Blank also does not contest Judge Cutler's finding that there were exigent circumstances that required the police to conduct the breath test. The only question that Blank raises is whether the statute authorized Trooper Tyler to conduct the breath test on the portable device. In my view, Trooper Tyler had authority to conduct the test under AS 28.35.031(g).

MANNHEIMER, Judge, dissenting.

Laura A. Blank struck and killed a pedestrian and then drove away from the scene. Soon thereafter, an Alaska State Trooper arrived at Blank's home to investigate. While Blank and the trooper sat in his patrol car discussing the situation, the trooper asked Blank to blow into a portable (handheld) breath testing device. Blank did so, and the result of this test showed that Blank had a blood alcohol level of .082 percent.

At the time (1994), the blood alcohol limit proscribed by Alaska law was .10 percent, so the trooper did not arrest Blank. However, Blank was later indicted for manslaughter and felony leaving the scene of an accident,[1] and the State introduced the breath test result at Blank's trial. The jury convicted Blank of both offenses.

In this appeal, Blank argues that the State should not have been allowed to introduce the breath test result at Blank's trial.

AS 28.35.031 defines various situations in which the police may lawfully demand that a motorist submit to a breath test. The State contends that the breath test administered to Blank was authorized by subsection (g) of this statute.

given consent to a chemical test or tests of the person's breath and blood for the purpose of determining the alcoholic content of the person's breath and blood and shall be considered to have given consent to a chemical test or tests of the person's blood and urine for the purpose of determining the presence of controlled substances in the person's blood and urine if the person is involved in a motor vehicle accident that causes death or serious physical injury to another person. The test or tests may be administered at the direction of a law enforcement officer who has probable cause to believe that the person was operating or driving a motor vehicle in this state that was involved in an accident causing death or serious physical injury to another person.

2. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *State v. Coon*, 974 P.2d 386 (Alaska 1999).

3. *State v. Blank*, 90 P.3d 156, 163 (Alaska 2004).

1. AS 11.41.120(a) and AS 28.35.050(a) / AS 28.35.060(a), respectively.

Under subsection (g), a motorist is required to submit to "a chemical test or tests of [their] breath" if the motorist has been involved in an injury accident, and if there is probable cause to believe that the motorist is guilty of a criminal offense connected to that accident and that testing the motorist's breath for its alcohol content will yield evidence relevant to that suspected crime, and if exigent circumstances require an immediate test.[2]

Blank does not dispute that she was subject to testing under this subsection of the statute. However, Blank contends that the chemical test administered to her in this case was outside the scope of testing authorized by this statute.

The issue is this: When subsection (g) speaks of a "chemical test or tests of [a] person's breath", are these breath tests confined to tests conducted with a breath testing instrument whose operation and calibration are certified by the Department of Public Safety under Title 13, chapter 63 of the Alaska Administrative Code? Or does the phrase "chemical test or tests" encompass all forms of breath testing, even tests conducted with a non-certified portable breath testing device like the one used by the trooper in Blank's case?

Both of my colleagues are convinced that this statutory language is broad enough to encompass breath tests conducted in the field using non-certified portable testing devices. I disagree.

It is true that the phrase "chemical test or tests" does not appear to prescribe or limit the types of testing devices that the police may employ when conducting the breath tests authorized by subsection (g). But subsection (g) does not stand by itself.

AS 28.35.031 has three subsections—(a), (b), and (g)—that authorize the police to conduct breath tests of motorists. Subsections (a) and (g) require motorists to submit to "a chemical test or tests of [their] breath", while subsection (b) requires motorists to submit to a "preliminary breath test".

As I explain in more detail below, the result of a breath test administered under either subsection (a) or subsection (g)—but not the result of a preliminary breath test administered under subsection (b)—can establish a person's guilt of driving under the influence under AS 28.35.030(a)(2) (the portion of the statute that prohibits driving when a person's blood alcohol level equals or exceeds .08 percent). Moreover, the result of a breath test administered under either subsection (a) or subsection (g)—but not the result of a preliminary breath test administered under subsection (b)—can trigger the administrative revocation of a person's driver's license under AS 28.15.165–166 (requiring administrative license revocation if a person's breath test result equals or exceeds .08 percent).

In other words, the test result of a "chemical test" authorized by either subsection (a) or subsection (g) can trigger significant legal consequences, but the test result of a "preliminary breath test" carries no penalty.

This drastic difference in consequences is attributable to the fact—a fact repeatedly demonstrated by the legislative history of these various statutes—that the legislature and the Department of Public Safety have always proceeded under the assumption that the "chemical tests" authorized by subsections (a) and (g) would be conducted on breath testing machines that are approved and certified by the Department of Public Safety (in other words, the breath testing machines that are installed, and periodically calibrated, in police stations and other fixed locations), while the "preliminary breath tests" authorized by subsection (b) would be conducted by officers in the field using portable breath testing devices that the Department of Public Safety would not need to approve or certify (because the test result had no legal consequences for the motorist).

If the phrase "chemical test or tests" in subsections (a) and (g) is construed as my colleagues propose—that is, if this phrase encompasses *all* breath tests, even the tests conducted on hand-held breath testing devices that have not been approved or certified by the Department of Public Safety— then people could be convicted of driving

2. *See State v. Blank,* 90 P.3d 156, 160–62 (Alaska 2004) (an earlier stage of this same case).

under the influence, and people could have their driver's license administratively revoked, based on a test result obtained with a non-certified portable breath testing device.

The legislature never intended this. And for this reason, my colleagues' interpretation of this statutory language must be wrong.

For the reasons explained here, I conclude that only AS 28.35.031(b) authorizes the police to conduct breath tests using non-certified portable breath testing devices. In contrast, AS 28.35.031(a) and (g) require that the breath tests authorized by these subsections be conducted with a testing instrument certified by the Scientific Director of the State Crime Lab, under the testing procedures specified in 13 AAC 63.

Because the breath test in Blank's case was conducted on a non-certified portable breath testing device, this breath test was not authorized by AS 28.35.031(g). It was therefore error for the superior court to allow the State to introduce the result of that breath test at Blank's trial.

I believe that this error was harmless with respect to Blank's conviction for leaving the scene of an injury accident. However, this error requires the reversal of Blank's conviction for manslaughter.

*The procedural background of this litigation*

This is the second time that Blank's case has come before this Court.

Blank originally attacked the admission of the breath test result on two grounds: first, that AS 28.35.031(g) was unconstitutional because it did not require the police to have reason to believe that a motorist had committed a criminal offense before requiring the motorist to submit to chemical testing; and second, that even if subsection (g) was constitutional, the police were not authorized to use a portable breath testing device to conduct the chemical tests authorized by that statute.

We agreed with Blank that subsection (g) was unconstitutional.[3] For this reason, we reversed Blank's convictions without reaching her argument concerning the portable testing device.

However, the State petitioned the Alaska Supreme Court to review our decision. In *State v. Blank*, 90 P.3d 156 (Alaska 2004) (*"Blank II"*), the supreme court adopted a narrowing construction of AS 28.35.031(g) to save it from constitutional infirmity. The supreme court interpreted subsection (g) to authorize chemical testing of a person's breath or blood if (1) the police have probable cause to believe that the person committed a criminal offense while operating a motor vehicle that was involved in an accident causing death or serious physical injury to another person, (2) the police have probable cause to believe that evidence of the person's blood alcohol level will be relevant to the proof or disproof of this suspected offense, and (3) exigent circumstances justify an immediate test.[4]

The supreme court concluded that the first two prongs of this test were met in Blank's case, but the court remanded Blank's case to the superior court for a decision on whether the circumstances justified an immediate test. On remand, the superior court concluded that exigent circumstances had justified immediate administration of a breath test. Accordingly, the superior court re-affirmed its decision that the breath test result was properly admitted at Blank's trial.

Blank now returns to this Court. She does not challenge the superior court's ruling regarding exigent circumstances. However, she renews her argument that the police can not use a portable breath testing device to administer the chemical tests authorized by subsection (g).

*Why I conclude that the statutory phrase "chemical test or tests of [a] person's breath" is limited to breath tests performed on a certified breath testing instrument, and thus does not include tests conducted in the field with a non-certified portable breath testing device*

Three subsections of AS 28.35.031 describe different circumstances in which the operator

---

3. *Blank v. State*, 3 P.3d 359, 366, 370 (Alaska App.2000) (*"Blank I"*).

4. *Blank II*, 90 P.3d at 160–62.

of a motor vehicle is deemed to have "consented" to chemical testing of their breath—that is, circumstances in which a motorist has a legal duty to submit to breath testing.

*Subsection (a)*

Under subsection (a) of AS 28.35.031, a person must submit to "a chemical test or tests of the person's breath for the purpose of determining the alcoholic content of the person's blood or breath" if the person has been "lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating ... a motor vehicle ... while under the influence" of intoxicants.

Refusal to submit to this test is a separate criminal offense, carrying a punishment equivalent to the punishment for driving under the influence.[5] That is, refusal to submit to the breath test authorized by subsection (a) is a class A misdemeanor or a class C felony, depending on the motorist's prior record.

When AS 28.35.031 was originally enacted, the situation described in subsection (a) was the sole circumstance in which a motorist was required to submit to breath testing.[6] In other words, the police could not require a motorist to submit to a chemical test of their breath unless the motorist had first been lawfully arrested for driving under the influence (or some other crime involving the operation of a motor vehicle while under the influence).

But in 1983, the legislature amended AS 28.35.031 by adding subsection (b), as well as the ancillary subsections (c)-(f).[7] These subsections describe a motorist's duty to submit to a "preliminary breath test" even though the motorist has not yet been arrested.

*Subsection (b)*

Under subsection (b) of AS 28.35.031, a person must submit to a "preliminary breath test" when, even though the person is not yet under arrest, the police have "probable cause

to believe that [the] person's ability to operate a motor vehicle ... is impaired by the ingestion of alcoholic beverages" and probable cause to believe that the person "was operating a motor vehicle ... involved in an accident" or that the person "committed a moving traffic violation".

An ancillary portion of the statute—subsection (d)—states that the police may use the result of a preliminary breath test administered under subsection (b) "to determine whether the [motorist] should be arrested".

It is unlawful to refuse to submit to a preliminary breath test, but refusal of this test is merely an infraction.[8] The apparent reason for this slight penalty is that the officer must already have probable cause to make an arrest before the motorist can be asked to take the preliminary breath test, and, under subsection (d), the preliminary breath test is only an aid to the officer in strengthening or weakening the pre-existing grounds for arrest.

Subsection (f) of AS 28.35.031 clarifies the relationship between the "preliminary breath test" authorized in subsection (b) and the "chemical test or tests" authorized in subsection (a). Subsection (f) states that if, after the police administer the preliminary breath test, the police decide to arrest the motorist, then "the provisions of [subsection (a)] apply". In other words, the arrested motorist is now obliged to take the breath test authorized in subsection (a), and the motorist faces the much greater penalties for refusal.

*A closer examination of subsection (a) and subsection (b)*

As already explained, Blank's case does not directly involve either subsection (a) or subsection (b). Rather, the issue is whether the breath test administered to Blank was authorized by subsection (g).

But the operative language of subsection (g)—"chemical test or tests of [a] person's breath"—is the same language found in sub-

---

5. See AS 28.35.032(f) (definition of the offense), (g) (misdemeanor penalties), and (p) (felony penalties for repeat offenders).

6. SLA 1969, ch. 83, § 1.

7. SLA 1983, ch. 77, § 16.

8. AS 28.35.031(c).

section (a). In fact, this statutory language originated in subsection (a); the legislature simply re-used this language when they enacted subsection (g) twenty-five years later. For these reasons, the resolution of Blank's case requires a closer examination of subsection (a)—and then, following this examination of subsection (a), a comparison of the "chemical test" authorized by subsection (a) to the "preliminary breath test" authorized by subsection (b).

Before beginning this discussion, it is important to note one way in which subsections (a) and (b) are alike: neither subsection describes the type of testing equipment that police officers must (or must not) employ when conducting the authorized breath tests. Subsection (a) simply refers to a "chemical test or tests of the person's breath", while subsection (b) simply refers to a "preliminary breath test".

My colleagues conclude that these two different phrases refer simply to the timing and purpose of the breath tests authorized by these statutes—and that these phrases do not describe or limit the types of testing devices that the police can use when administering these breath tests.

I believe that this conclusion is wrong. The wording and history of subsection (a), the wording and history of certain related sections of AS 28.35, and the legislative history of subsection (b) all point to a different conclusion: when the legislature enacted subsection (b) and its "preliminary breath test" in 1983, both the legislature and the Department of Public Safety understood that the "chemical tests" authorized by subsection (a) would be conducted at police stations using certified breath testing instruments under the procedures specified in 13 AAC 63, while the "preliminary breath tests" authorized by subsection (b) would be conducted in the field using non-certified hand-held breath testing devices.

*The pre–1983 history of subsection (a)*

AS 28.35.031(a), which originally comprised the entirety of AS 28.35.031, was enacted in 1969 along with two companion statutes. These companion statutes were AS 28.35.032, which prescribed the consequences of refusing the breath test, and AS 28.35.033, which defined the legal presumptions arising from a breath test result, assuming that the test was performed, and its result evaluated, in accordance with the methods specified by the Department of Health and Social Services.[9]

(The mandatory testing methods and evaluative procedures were initially codified in 7 AAC 30 (effective February 1970).[10] Later, after the Governor transferred the duty of approving and certifying breath test instruments to the Department of Public Safety,[11] the methods and procedures were moved to 13 AAC 63 (effective April 1989).)

Initially, the Department of Health and Social Services certified the Breathalyzer as the instrument that police agencies were to use when conducting the breath tests authorized by AS 28.35.031. *See Wester v. State,* 528 P.2d 1179 (Alaska 1974) (describing the working of the Breathalyzer, and answering questions concerning the evidentiary foundation that the State had to establish before the State could introduce the test results), and *Oveson v. Anchorage,* 574 P.2d 801 (Alaska 1978) (answering other questions regarding the foundational requirements for introducing the result of a test conducted with a Breathalyzer instrument).

By 1978, both the Alaska Supreme Court and police agencies around the state were using the term "Breathalyzer test" as a synonym for the "chemical test or tests" authorized by AS 28.35.031(a). *See, e.g., Graham v. State,* 633 P.2d 211 (Alaska 1981) (*passim*); *Wirz v. State,* 577 P.2d 227 (Alaska 1978) (*passim*). This Court followed the same practice in our decisions. *See, e.g., Anchorage v. Serrano,* 649 P.2d 256 (Alaska App. 1982) (*passim*). There are no reported

9. All three statutes were enacted by SLA 1969, ch. 83, § 1.

10. *See Keel v. State,* 609 P.2d 555, 557 n. 9 (Alaska 1980); *Oveson v. Anchorage,* 574 P.2d 801, 804 (Alaska 1978).

11. *See* Executive Order No. 67, § 2 (1987).

cases in which the State or a municipal government attempted to introduce a test result from any other breath testing device.

In 1980, the legislature amended the definition of the offense of driving while intoxicated—AS 28.35.030(a)—in a manner that changed the legal significance of the breath tests authorized by subsection (a) of AS 28.35.031. Under the new definition of driving while intoxicated, a person could commit the crime in either of two ways: (1) by operating a motor vehicle while under the influence of intoxicants, or (2) by operating a motor vehicle when the person's blood alcohol level was .10 percent or greater.[12]

Before this 1980 amendment, the result of a "chemical test" of a person's breath might trigger a presumption that the person was under the influence, see AS 28.35.033(a), but a person's blood alcohol level was not, by itself, sufficient to establish the crime of driving while intoxicated. The 1980 amendment changed that. After this amendment, a person could be found guilty simply because they were driving with a certain level of alcohol in their blood-and the result of a "chemical test" conducted within four hours of the event was deemed prima facie evidence of that blood alcohol level.[13]

In 1982, in large part because of this change in the law, this Court held that the due process clause of the Alaska Constitution prohibited the government from introducing the result of a breath test in a criminal trial unless the police agency who administered the breath test preserved an extra breath sample of the defendant's breath, so that a corroborative test could be performed. *Anchorage v. Serrano*, 649 P.2d 256, 259–260 (Alaska App.1982).

*The enactment of subsection (b)—the "preliminary breath test"*

In 1983, the year after this Court decided *Anchorage v. Serrano*, the legislature enacted the provisions that govern the "prelimi-

nary breath test"—subsections (b) through (f) of AS 28.35.031.

Unlike subsection (a), which only authorizes the testing of persons who have been arrested, subsection (b) declares that a person must submit to a "preliminary breath test", even though the person is not yet under arrest, if the police have "probable cause to believe that [the] person's ability to operate a motor vehicle ... is impaired by the ingestion of alcoholic beverages" and probable cause to believe that the person "was operating a motor vehicle ... involved in an accident" or that the person "committed a moving traffic violation". The police may then use the result of the preliminary breath test to help them decide whether to arrest the person. *See* AS 28.35.031(d).

As I pointed out earlier, subsection (b) does not specify the testing device that the police are to use when conducting preliminary breath tests. However, the wording and the legislative history of subsection (b)—especially, the fact that motorists are obliged to submit to the preliminary breath test *before* an arrest—demonstrate that the legislature anticipated that preliminary breath tests would normally be administered at the side of the road or in a patrol car, incident to a traffic stop.

As a practical matter, this meant that preliminary breath tests could not be performed on the Breathalyzer—because Breathalyzer instruments had to be installed, tested, and operated at a particular fixed location, due to potential radio frequency interference.[14] This fact suggests that the legislature anticipated that preliminary breath tests would be administered using a portable breath testing device rather than the Breathalyzer.

This inference is confirmed by the legislative history of House Bill 6 (13th Legislature)—the bill that ultimately became SLA 1983, ch. 77, and that enacted subsections (b) through (f) of AS 28.35.031. House Bill 6 was substantially reworked in the House Judicia-

---

**12.** SLA 1980, ch. 129, § 10 (effective September 28, 1980).

**13.** *Conrad v. State*, 54 P.3d 313, 315 (Alaska App.2002), *on rehearing*, 60 P.3d 701, 702 (Alaska App.2002).

**14.** *See Thayer v. Anchorage*, 686 P.2d 721, 724–25 (Alaska App.1984), and former 7 AAC 30.050.

ry Committee, and the Judiciary Committee Minutes of April 28, 1983 contain a sectional analysis of Committee's version of the bill.

Section 14 of the bill (the portion that ultimately became section 16 of SLA 1983, ch. 77) authorized the pre-arrest "preliminary breath test" and described the circumstances in which a motorist was obliged to take this preliminary test.

Section 15 of the bill (the portion that ultimately became section 17 of SLA 1983, ch. 77) amended AS 28.35.032, the statute that specifies the penalties for breath test refusal. Previously, AS 28.35.032 made it a crime to refuse "[any] request of a law enforcement officer to submit to a chemical test of breath as provided in AS 28.35.031"—that is, any request to submit to a chemical test under what is now subsection (a) of AS 28.35.031. But House Bill 6 narrowed this language: Under the amended wording, it was now a crime to refuse "[any] request of a law enforcement officer to submit to a chemical test *under AS 28.35.031(a)* ". (Emphasis added)

In other words, now that AS 28.35.031 authorized two types of breath tests—the pre-arrest "preliminary breath test" authorized by subsection (b), and the post-arrest "chemical test" authorized by subsection (a)—the legislature amended AS 28.35.032 so that its severe penalties for breath test refusal would be imposed only on those people who refused the post-arrest breath test. In contrast, the legislature declared that refusal to submit to the preliminary breath test authorized by subsection (b) was only an "infraction"—a minor offense punishable by a fine. *See* AS 28.35.031(c).

This interpretation of the legislature's action is confirmed by the sectional analysis of House Bill 6. The sectional analysis of Section 15 states that the above-described amendment to AS 28.35.032 was intended to "ma[ke] it clear that [only] refusing to submit to a chemical test *after being arrested* [will] constitute[ ] the crime of refusing to submit to a chemical test". (Emphasis in the original)

One month later, when the Senate Judiciary Committee was discussing a committee substitute for House Bill 6, Senator Mitchell Abood proposed additional language to clarify this concept. He suggested that the bill be amended to explicitly state that "the preliminary breath test [authorized by subsection (b) ] is in addition to the Breathalyzer test [authorized by subsection (a) ]", and that "if a driver is arrested, the provisions of [subsection (a) ] apply". Senator Abood emphasized "that the preliminary breath test [was] not [to be] a substitute for the Breathalyzer test", and that "a person must be arrested before [being] subjected to any type of testing for DWI".[15]

Obviously, the senator's last statement can not be interpreted literally, because the senator was proposing a law that *would* subject people to a type of breath testing—the preliminary breath test—even though they had not yet been arrested. Reading Senator Abood's words in context, what the senator must have meant is that:

(1) the preliminary breath test was only to be used as an aid for determining whether to arrest a motorist; the result of a preliminary breath test could not be used to establish a person's blood alcohol level for the purpose of assessing whether they were guilty of driving while intoxicated under AS 28.35.030(a)(2) (the blood alcohol level clause of the statute), or for the purpose of triggering the presumption of intoxication described in AS 28.35.033(a); instead,

(2) the only breath test result that would trigger these adverse consequences (guilt of DWI under AS 28.35.030(a)(2), or a presumption of intoxication under AS 28.35.033(a)) was the result of a post-arrest "chemical test" authorized by subsection (a)—what Senator Abood referred to as the "Breathalyzer test".

This interpretation is corroborated by another provision of the same session law: SLA 1983, ch. 77, § 3. Section 3 of this session law enacted two new statutes—AS 28.15.165 and AS 28.15.166—that authorized administrative revocation of a person's driver's license based

---

**15.** Senate Judiciary Committee, Minutes of May 30, 1983.

on the result of a breath test administered under subsection (a) of AS 28.35.031.

The first statute, AS 28.15.165, authorized the immediate seizure and administrative revocation of the driver's license of (1) any person whose breath test result was greater than or equal to the blood alcohol level specified in the DWI statute or (2) any person who refused a mandated breath test. The second statute, AS 28.15.166, authorized administrative review of this license revocation, but the review was limited to three issues: whether the arresting officer had probable cause to believe that the person was driving while intoxicated, and (alternatively) whether the chemical test yielded a result above the legal limit, or whether the person refused to take the test.[16]

Both of these administrative license revocation statutes specified that the only test result that triggered these administrative consequences was the result of a test conducted under *subsection (a)* of AS 28.35.031—that is, a test result from a post-arrest breath test performed on a certified breath testing instrument. The result of a preliminary breath test did not trigger these administrative consequences. Likewise, a refusal to submit to a post-arrest breath test authorized by subsection (a) would trigger these administrative consequences, but not a refusal to submit to a preliminary breath test.

*My conclusions regarding the legislative intent behind subsections (a) and (b)*

As I explained early in this dissent, neither the wording of subsection (a) ("chemical test or tests") nor the wording of subsection (b) ("preliminary breath test") gives any outward indication that the police are required to use, or are forbidden from using, particular testing instruments or devices when they administer the breath tests authorized by these two subsections.

But based on the pre–1983 history and judicial interpretation of subsection (a), and based on the wording and legislative history of subsection (b), I conclude that the legislature anticipated that pre-arrest breath tests

and post-arrest breath tests would be conducted with two different types of testing devices. When the legislature enacted the pre-arrest "preliminary breath test" in 1983, they acted under the assumption that the post-arrest "chemical test" authorized in subsection (a) would continue to be conducted at a police station using a Breathalyzer (the certified breath test instrument at the time), while the "preliminary breath test" authorized in subsection (b) would be conducted in the field using a portable breath testing device—a device that need not have a proven level of accuracy.

My interpretation of the legislative record is corroborated by the testimony given at Blank's trial by two employees of the State Crime Lab, Kathryn Echols and Everett Clary. Echols testified that the portable testing device commonly used to administer the preliminary breath test was not certified and approved for evidentiary use (as of 1995), and Clary testified that the only breath testing device that was certified and approved for evidentiary use (again, as of 1995) was the Intoximeter 3000.

In other words, the Department of Public Safety does not assess or certify the accuracy and functioning of the portable breath testing devices used by officers in the field to conduct the preliminary breath tests authorized by subsection (b). In contrast, the Department does assess and certify the breath testing instruments that are used to conduct the "chemical tests" authorized by subsection (a). Indeed, an entire chapter of the Alaska Administrative Code—13 AAC 63—is devoted to specifying the requirements and procedures for certifying these breath testing instruments and for training and certifying the officers who operate and calibrate them.

The Department's failure to analyze and certify portable breath testing devices suggests that the Department shares my interpretation of AS 28.35.031. That is, the Department's decision not to test or certify portable breath testing devices implies that the Department does not believe that the test results from these portable devices will be used for any official purpose, other than pro-

16. AS 28.15.166(g).

viding police officers with additional information when they are deciding whether to arrest a motorist.

And while my interpretation of AS 28.35.031 must stand or fall on the strength of my reasoning, the Department's interpretation of this statute is entitled to independent weight—because the Department is the agency entrusted with the duty of administering this statute by certifying the instruments and prescribing the procedures that are used for conducting breath tests in this state.[17]

Finally, the fact that the Department does not analyze or certify portable breath testing devices means that the interpretation of AS 28.35.031 adopted by my colleagues leads to results that are both illogical and contrary to the legislature's intentions.

As Judge Coats explains in his concurring opinion, the basic premise that he and Judge Stewart share is that the statutory phrase found in both subsection (a) and subsection (g)—"chemical test or tests"—is broad enough to encompass all forms of chemical testing, even breath tests that are performed on non-certified portable breath testing devices. But if this is so—if a test run on a portable breath testing device qualifies as a "chemical test" for purposes of subsections (a) and (g)—then police officers who arrest a person for driving under the influence would have no need to drive the person to a police station for testing on a DataMaster (the current successor to the Breathalyzer). The police officer could simply demand that the person blow into a portable breath testing device.

If the test result obtained with this non-certified portable testing device was .08 percent or greater, the person's driver's license would be administratively revoked under AS 28.15.165–166—because the test conducted with this portable breath testing device would now qualify as a "chemical test administered under ... AS 28.35.031(a)". Like-

wise, if the result of this "chemical test" was .08 percent or greater, the government would have a prima facie case that the person was guilty of DUI under AS 28.35.030(a)(2). And finally, if the motorist refused to blow into the portable breath testing device, and instead insisted on going to the police station for testing on a certified breath testing instrument, the motorist could be charged with misdemeanor breath test refusal under AS 28.35.032(f) or felony breath test refusal under AS 28.35.032(p)—again, because a test conducted with a portable breath testing device would now qualify as a "chemical test authorized by ... AS 28.35.031(a)".

It is inconceivable that the legislature intended the language of AS 28.35.031(a) to be interpreted and applied in this way. The legislative history of both subsection (a) and subsection (b) demonstrates that, although the legislature was content to have preliminary breath tests conducted with non-certified hand-held devices of unproven accuracy, the chemical tests authorized by subsection (a) are to be conducted using breath testing instruments that are certified, maintained, and operated under procedures established by the Department of Public Safety.

For these reasons, I conclude that the phrase "chemical test or tests" in subsection (a) of AS 28.35.031 does not include breath tests that are conducted using non-certified portable breath testing devices.

*Subsection (g)*

I now turn to subsection (g) of AS 28.35.031—the portion of the statute that, according to the State and my colleagues, authorized the breath test that was administered to Blank.

Subsection (g) was the last part of AS 28.35.031 to be enacted. It was enacted in

---

17. *Bartley v. Teachers' Retirement Board*, 110 P.3d 1254, 1261 (Alaska 2005); *Grimm v. Wagoner*, 77 P.3d 423, 433 (Alaska 2003); *Union Oil Co. v. Alaska Dep't of Revenue*, 560 P.2d 21, 23–24 (Alaska 1977). *Cf.* Norman J. Singer, *Sutherland on Statutes and Statutory Construction* (6th ed.2000), § 49:05, Vol. 2B, pp. 52–53 ("Ordinari-

ly, courts should give great weight to the frequent, consistent, and long-standing construction of a statute by an agency charged with its administration, particularly with respect to a statute that is susceptible of two different interpretations.").

1994, eleven years after the legislature authorized the preliminary breath test.[18]

Like subsection (a) of the statute, subsection (g) authorizes the police to require a person to submit to a "chemical test or tests of [their] breath". But unlike subsection (a), subsection (g) does not require the police to arrest the motorist as a prerequisite to this breath testing. Rather, the authority to administer a breath test arises if (1) the police have probable cause to believe that the motorist was involved in a motor vehicle accident that caused death or serious physical injury to another person, and that the motorist committed a crime connected to this accident; and (2) the police have probable cause to believe that the presence or absence of alcohol in the motorist's body will be relevant to the proof or disproof of this suspected crime; and (3) exigent circumstances require immediate testing.[19]

I have already explained why I conclude that the phrase "chemical test or tests of [a] person's breath", as employed in subsection (a) of the statute, does not include breath tests conducted with a non-certified portable breath testing device. Because this same language is used in subsection (g), and because both subsections (a) and (g) are part of the same statute, the law presumes that the legislature intended this statutory language to mean the same thing in both subsections.[20]

The question, then, is whether anything in the legislative history of subsection (g) suggests that the legislature intended this language to have a broader meaning than it has in subsection (a). The answer is that the legislative history suggests exactly the opposite. The legislative history confirms that

the legislature intended this language to have the same meaning in both subsections.

When this proposed law—House Bill 445 am (18th Legislature)—was discussed in the House Judiciary Committee on March 14, 1994, one of the first questions addressed to the Deputy Commissioner of Public Safety (who was appearing in support of the bill) was why the Department was proposing to have motorists tested if these motorists were not being arrested for any crime. The deputy commissioner explained that, by and large, subsection (g) would be used to obtain chemical tests from motorists who were indeed suspected of crimes.

The deputy commissioner told the committee that the main purpose of subsection (g) was to solve a financial problem. The problem was this: Motorists who were suspected of crimes in connection with injury accidents were often sent to a hospital for treatment or observation as a result of the accident. Under the then-current version of AS 28.35.031—that is, under subsection (a) of the statute—these motorists could not be subjected to chemical testing unless they were first arrested. But if a motorist was arrested, the Department of Public Safety became responsible for their hospital bills. For this reason, the Department was asking the legislature to authorize mandatory chemical testing even if the person was not under arrest.[21]

(The deputy commissioner reiterated this rationale for the proposed law when he appeared in front of the House Finance Committee on April 19, 1994 and in front of the Senate Finance Committee on May 4, 1994 to support the bill.)[22]

A little later in the House Judiciary Committee hearing, another member of the com-

18. SLA 1994, ch. 55, § 7.

19. See Blank II, 90 P.3d at 160–62 (interpreting the statute to require proof of these elements).

20. See Chugach Natives, Inc. v. Doyon, Ltd., 588 F.2d 723, 725–26 (9th Cir.1978) (the same words or phrases are presumed to have the same meaning when used in different parts of a statute).

21. House Judiciary Committee, Minutes of March 14, 1994, Tape 94–41, Side A, Log Numbers 683–720.

22. House Finance Committee, Minutes of April 19, 1994, Tape HFC 94–132, Side 2 (The deputy commissioner "stressed that, in most serious injury or fatal accidents, it is not practical for the officer to make an arrest because the state would be liable for medical costs if the person is arrested.") Senate Finance Committee, Minutes of May 4, 1994, Tape SFC 93–87, Side 2 (The deputy commissioner stated that, "in major injury accidents, the person would usually be in the hospital, and if an arrest [were] made, the department would be responsible for that person from that time on.")

mittee asked the deputy commissioner about the accuracy of the drug and alcohol tests available to the police. The deputy commissioner replied (in part) that he believed the Intoximeter 3000 to be accurate, since these devices were maintained on a daily basis.[23]

(The Intoximeter 3000 replaced the Breathalyzer as the state-approved breath testing instrument in May 1983.)[24]

The deputy commissioner's answer to the committee member's inquiry strongly implies that the Department of Public Safety anticipated that the breath tests authorized by subsection (g) would be performed using the same breath testing instruments that were employed for the breath tests authorized by subsection (a)—in other words, breath testing instruments that were certified, maintained, and operated under procedures established by the Department of Public Safety.

This interpretation is corroborated by several other provisions of the resulting session law, SLA 1994, ch. 55.

Sections 8 and 10 of the 1994 session law amended AS 28.35.032, the statute that makes it a crime to refuse a mandated breath test. This statute had previously covered refusals to submit to a post-arrest chemical test authorized by AS 28.35.031(a), but not refusals to submit to a preliminary breath test authorized by AS 28.35.031(b). In the 1994 session law, AS 28.35.032(a) was amended so that the statute now includes refusals to submit to a chemical test authorized by AS 28.35.031(g), and AS 28.35.032(f) was amended so that refusal to submit to a chemical test authorized by AS 28.35.031(g) carries the same penalty as refusal to submit to a chemical test authorized by subsection (a). In contrast, refusal to submit to a preliminary breath test authorized by subsection (b) remains an infraction punishable only by a fine.

Similarly, section 9 of the 1994 session law amended AS 28.35.032(e), the statute which declares that a person's refusal to submit to a mandated breath test can be admitted into evidence against them in a civil or criminal action. This statute had previously included

refusals to take a chemical test authorized by AS 28.35.031(a), but not refusals to take a preliminary breath test authorized by AS 28.35.031(b). After the 1994 amendment, this statute also included refusals to submit to a chemical test authorized by AS 28.35.031(g)—but still not refusals to submit to a preliminary breath test.

Sections 1, 2, and 3 of the 1994 session law amended AS 28.15.165 and AS 28.15.166—the two statutes that authorize the Department to administratively revoke the driver's license of any person whose breath test result equals or exceeds the blood alcohol level specified in AS 28.35.030(a)(2), or any person who refuses a mandated breath test.

As I explained earlier in this dissent, before the 1994 amendment, these statutes imposed administrative license revocation based either on the result of a breath test administered under subsection (a) of AS 28.35.031, or on the refusal to submit to a breath test authorized by that subsection—but not based on the result of a preliminary breath test, or on refusal to submit to a preliminary breath test.

The 1994 amendments expanded these license revocation statutes by imposing administrative license revocation based on the result of a breath test authorized by either subsection (a) or subsection (g) of AS 28.35.031, or based on a refusal to submit to a breath test authorized by either of these subsections. But the statutes, even as amended, still did not cover the test result of a preliminary breath test, or the refusal to submit to a preliminary breath test.

Section 4 of the 1994 session law enacted a corresponding amendment to AS 28.15.181(a)(8). As amended, this statute declared that a conviction for refusal to submit to a chemical test authorized by either subsection (a) or subsection (g) of AS 28.35.031—but not a refusal to take the test authorized by subsection (b)—was grounds for immediate revocation of the person's driver's license.

---

**23.** House Judiciary Committee, Minutes of March 14, 1994, Tape 94–41, Side B, Log Numbers 007–034.

**24.** *See Herter v. State,* 715 P.2d 274, 275 (Alaska App.1986).

In other words, the administrative revocation of a driver's license now hinges on the result of a breath test administered under either subsection (a) or subsection (g), or on a refusal to submit to a test authorized by either of these two subsections—but not on the results of, or a refusal to submit to, a preliminary breath test administered under subsection (b).

In all of these 1994 amendments, the legislature changed the provisions of Title 28 so that the same consequences attached to the results of the breath tests authorized by subsections (a) and (g) of AS 28.35.031, or to a motorist's refusal to submit to either of these tests. In contrast, the result of a preliminary breath test authorized by subsection (b), or the refusal to submit to a preliminary breath test, has markedly different (*i.e.*, markedly less severe) consequences.

All of this corroborates the conclusion that the legislature intended or assumed that the breath tests administered under subsection (g) would be conducted in the same fashion as the breath tests administered under subsection (a). In other words, these tests would be conducted with breath testing instruments whose operation and calibration are certified by the Department of Public Safety under 13 AAC 63, rather than on non-certified portable breath testing devices.

### My conclusion

Both AS 28.35.031(a) and AS 28.35.031(g) authorize the police to require motorists to submit to a "chemical test or tests of [their] breath". The question presented in this appeal is whether this statutory language is limited to breath tests conducted with a certified breath testing instrument—that is, a breath testing instrument whose operation and calibration are certified by the Department of Public Safety under 13 AAC 63—or whether this statutory language includes breath tests conducted with a non-certified portable breath testing device.

I have described the histories of subsections (a) and (g), as well as the history of the contrasting subsection of the statute, subsection (b). I have also described the legislature's enactment and amendment of various other statutory provisions related to these three subsections. Everything points to the conclusion that the legislature believed and intended that the breath tests authorized by subsections (a) and (g) would be performed on certified breath testing instruments—instruments that meet the standards of accuracy established by the Scientific Director of the Crime Lab, and that are operated and periodically calibrated in accordance with the procedures specified in 13 AAC 63. The legislature did not intend for these tests to be performed on non-certified portable breath test devices of unproven accuracy.

Accordingly, I conclude that Blank's position in this appeal is correct: Blank was subject to testing under AS 28.35.031(g), but the test performed in Blank's case fell outside the scope of testing authorized by subsection (g)—because this test was conducted with a non-certified portable breath testing device. The State should not have been allowed to introduce the result of this unauthorized breath test.

When this Court issued its first decision in Blank's case, I concluded that the error in admitting the breath test result was harmless with respect to Blank's conviction for leaving the scene of an injury accident, but that this error required reversal of Blank's conviction for manslaughter. *See Blank I*, 3 P.3d at 371–72 (Mannheimer, J., dissenting). I still hold this view. I would therefore affirm Blank's conviction for felony hit-and-run, but I would reverse her conviction for manslaughter.